[No. S014636. June 19, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY DAVID DAVIS, Defendant and Appellant.

## COUNSEL

Mark D. Greenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

William T. Harter, Susan Lee Frierson, Robert M. Snider, Elaine F. Tumonis and Sonja K. Berndt, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190 et seq.).

On April 28, 1989, the District Attorney of Ventura County filed an amended information against defendant Larry David Davis in the superior court of that county.

Count I charged that, on or about August 28, 1988, defendant murdered Dawn Michelle Holman. (Pen. Code, § 187.) It was alleged for death eligibility that he did so under the special circumstances of (1) felony-murder kidnapping (*id.*, §§ 207 & 209 [kidnapping for ransom/robbery]); (2) felony-murder sodomy (*id.*, § 286, subd. (c)); and (3) felony-murder rape (*id.*, § 261). (*Id.*, § 190.2, subd. (a)(17)(i), (ii), & (iv).)

Count II charged that, on or about August 28, 1988, defendant committed forcible sodomy on Holman (Pen. Code, § 286, subd. (c).)

Count III charged that, on or about August 28, 1988, defendant kidnapped Holman. (Pen. Code, § 207, subd. (a).)

Count IV charged that, on or about August 28, 1988, defendant committed sexual battery on Suzanne H. (Pen. Code, § 243.4.)

Count V charged that, on or about August 28, 1988, defendant assaulted Holman with intent to commit rape and/or sodomy. (Pen. Code, §§ 220, 261, subd. (2), & 286.)

Count VI charged that, on or about August 28, 1988, defendant assaulted Suzanne H. with intent to commit rape and/or sodomy. (Pen. Code, §§ 220, 261, subd. (2), & 286.)

Count VII charged that, on or about August 28, 1988, defendant attempted to rape Holman. (Pen. Code, §§ 664 & 261.)

Defendant pleaded not guilty to the charges and denied the allegations. He subsequently moved to set aside the information under Penal Code section

995. The trial court dismissed the count charging the attempted rape of Holman; it struck the reference to rape in the count charging assault of Holman with attempt to commit rape and/or sodomy and the special circumstance of felony-murder rape. The trial court subsequently struck the reference to section 209 in special circumstance No. 2.

Trial was by jury. The panel returned a verdict finding defendant guilty as charged of the murder of Holman and fixed the degree at the first. It found true the accompanying allegations of the felony-murder special circumstances of felony-murder sodomy and felony-murder kidnapping. It also returned verdicts and findings to the effect that he kidnapped her, assaulted her with intent to commit sodomy, and attempted to sodomize her. It returned verdicts and findings to the effect that he assaulted Suzanne H. with intent to commit rape and/or sodomy and sexually battered her. It fixed the punishment for the murder at death. The trial court denied defendant's motions for a new trial and to reduce penalty (Pen. Code, § 190.4, subd. (e)). It proceeded to enter judgment as follows.

For the murder of Holman, it imposed the sentence of death. It imposed a term of four years, consecutive to the sentence for murder, for assault with intent to rape or sodomize Suzanne H. For the sexual battery of Suzanne H., it imposed the middle term of three years. For attempted sodomy of Holman, it imposed the middle term of three years; for kidnapping of Holman, it imposed the upper term of six years; for assault with intent to sodomize Holman, it imposed the upper term of six years. It stayed sentence of imprisonment temporarily, pending execution of the sentence of death, and permanently thereafter. (Pen. Code, § 654.)

As we shall explain, the judgment should be affirmed.

## I. FACTS

### A. *Guilt Phase*

The People introduced evidence to the following effect.

On the night of August 26, 1988, Suzanne H. met defendant at a bar and grill in Ventura. She initiated a conversation when she warned him that he was about to be burned by a cigarette in the crowded bar. She told him where she worked and mentioned that her birthday was the next day. Defendant suggested they have dinner the following evening. She arranged for him to stop by after she got off work at a restaurant, about 11 p.m. She had previously made plans to visit a friend, Sandy Camp, the same evening.

Defendant arrived at the restaurant at 7 p.m. the next night. Suzanne H. asked him to leave and return later, because the restaurant was busy. He returned at 9 p.m. and waited for her. At 11 p.m., they left in her car. She drove; defendant left his truck in the restaurant parking lot.

Defendant and Suzanne H. picked up Camp and went to a bar and restaurant where they had drinks. They then went to another restaurant. Suzanne H. and Camp did most of the talking; defendant appeared "distant" and "nonsocial." About 12:30 a.m., Suzanne H. said she wanted to leave because she had to make preparations for her relocation to New York in two days. She dropped Camp off at her apartment and defendant got into the front seat of the car. He told her she did not have to drive all the way to his truck in Ventura; she could drop him off at a friend's house in Oxnard instead.

Defendant gave Suzanne H. directions. At one point, when she asked where they were going, defendant said: "[I]t is just a little further." She became uneasy because they were "out in the middle of nowhere." Defendant asked to leave the car to urinate. She let him out and turned the car around; she wanted to drive off but felt she could not leave him "way out here." She told him she could not take him any farther because she did not have enough gas and did not want to be stranded. He told her it was just a little further down the road. He said his friend lived on a farm and had plenty of gas.

Suzanne H. saw a sign reading "Road ends quarter of a mile" and felt that something was "very, very wrong." It was close to 1 a.m. She drove to the end of the road and attempted to turn the car around. Defendant pulled the keys from the ignition and shoved his arm under her blouse and brassiere. He kissed her and "slobber[ed] all over [her] neck and just insult[ed] her." She opened her door and tried to leave, but defendant held onto her shoulder. She asked him why he was doing this to her; she was frightened and thought he was going to rape her and imagined herself dead, lying next to her car. He grabbed her crotch area and attempted to remove her pants.

Suzanne H., who had worked as a volunteer at a rape crisis unit, attempted to "talk her way out of the situation." First, she told him she was a lesbian; that seemed to excite him more. She then closed the car door, kissed him, and said she wanted to have intercourse with him, but not there. Defendant suggested a motel; she agreed. Defendant put the keys back into the ignition and she drove back towards the town.

Suzanne H. drove over the speed limit and rolled through stop lights, hoping to attract the attention of a police officer. She then pulled into

a gas station. She told defendant to pump the gas while she paid. At the cashier's booth, she told the cashier that defendant had tried to rape her and asked him to call the police. She also told another customer, a "biker," that defendant tried to rape her and asked him to call the police. The "biker" pushed her away. Defendant finished pumping the gas. He came up behind her, held her under her arms, and dragged her back to the car. She struggled and screamed loudly. Crying, she ran back over to the "biker." She told defendant she was not going anywhere with him. He went over to her car and disabled her engine by removing a coil. He ran across the street and disappeared.

About 2 a.m., two City of Port Hueneme police officers interviewed Suzanne H. at the gas station. She reported the incident and identified her attacker as a Black male. She refused to give further details and said she did not wish to "press charges," explaining that she wanted to go back to New York. She was unable to start her car; the officers looked in the engine and discovered the coil wire was missing. She called Camp and cried during the conversation. Camp picked her up at the gas station. Suzanne H. returned to New York a few days later.

About 2:30 a.m., the police officers stopped defendant about half a mile from the gas station, as he walked toward the back of a residence. They asked him for identification. He produced a license and said he was looking for a friend at the residence. One of the officers knocked at the door and asked if the occupants knew defendant. They did not. Defendant then said that he had been going to the back of the residence to urinate. He was checked for warrants, advised not to urinate in public, and released.

About 3 a.m., defendant approached Emanuel Manson in the front of a Safeway store. Defendant offered Manson $10 for a ride to Ventura. Manson said he would think about it; he entered the supermarket and purchased some items. Manson observed Holman approach in a car and heard defendant ask her if she would give him a ride to Ventura. Holman had left her home to buy cigarettes, telling her boyfriend and a guest that she would be right back.

Holman went into the supermarket and purchased cigarettes. She told Moses Vargas, a clerk at the supermarket, that a man had asked her for a ride to Ventura and asked Vargas if she should give him one. He asked which man, and she pointed to defendant outside. Vargas told her she should not give him a ride. She said she did not think that she would and that she would go home.

Vargas saw defendant walk to the passenger door of Holman's car. She opened the car door for him. They drove away.

A greenskeeper at the Buenaventura Golf Course discovered Holman's body at approximately 5 a.m. and called the police. The body was lying approximately 265 feet from the car. Her skirt was pulled up and her brassiere pulled down below her breasts. She had on only her left shoe; her right shoe was found in a ditch to the rear of the car.

Police officers and investigators conducted an examination of the area. Holman's car was found on the berm of a ditch. Neither her car keys nor her purse were found at the scene. The right door of the car was damaged, and had apparently swung open on impact with a telephone pole. A knife belonging to Holman was found in plain view on the dashboard of the car.

An autopsy indicated that the cause of Holman's death was manual strangulation. There were multiple deep bruises of the strap muscles of the neck and a fracture below the tongue. There were extensive external injuries, including bruises and abrasions, tears on the bottom of the right foot, and scrapes on the knees and the front of the legs. There were also severe internal injuries, including fractures of the ribs and tears in the lungs and liver. A large number of sperm were found in the anal canal; a smaller number were found in the vagina. There were stains on the clothing containing semen and fecal matter.

There was physical evidence linking defendant to the incident. A shoe-print discovered above the handle on the passenger-side front door of Holman's car was consistent with the pattern on defendant's shoes. A shard of glass found in the shirt defendant wore on the night of the murder had the same physical and chemical properties as glass from Holman's car. The shirt also had multiple bloodstains. Serological tests indicated that defendant was a possible donor of semen stains found on Holman's skirt. Hairs found on Holman's chest were also consistent with hair samples obtained from defendant.

Holman's purse was later found on the roof of a building outside the golf course. The purse contained Holman's driver's license. It also contained razor blades, a straw, a spoon, an empty brown vial, and a film canister. The film canister contained powder, possibly baking soda. Residue scraped from the small vial contained cocaine base.

On September 3, 1988, defendant was booked into Ventura County jail for the assault on Suzanne H. Michael Fisher, incarcerated for a parole violation, was assigned to receive new arrivals. In a conversation with Fisher, defendant said that he had "messed up" and that he thought he had broken someone's neck. Approximately two days later, after reading about

defendant's case in the newspaper, Fisher reported the conversation to Deputy Sheriff Troy Roberts. Fisher did not request or receive favors or lenient treatment as a result of the information he disclosed.

Deputy Sheriff Roberts had overheard the conversation. He recalled that Fisher asked defendant what was wrong. Defendant said, "I think I fucked up," and something to the effect that he thought he killed someone.

In November 1988, in a conversation with inmate Fernando Moreno, defendant asked if Moreno had "ever fucked a dead girl." Moreno replied, "No, you're crazy." Defendant responded, "You got to get 'em before the body gets cold." He told Moreno that he had been out with someone and somehow got stranded. He then met someone and talked her into giving him a ride; she was "dumb." She opened the door for him and they drove off. He started making passes at her, but "she didn't want to"; she was afraid, pulled over, pushed him, and told him to "get out." He grabbed the steering wheel and said, "Just keep on going bitch." He told Moreno that he engaged in vaginal and anal intercourse with the woman, saying he liked it better "through the ass."

Moreno subsequently reported the conversation to investigators in the district attorney's office. He agreed to testify and was temporarily released from custody for seven days to attend the birth of his second child.

On January 21, 1989, Deputy Adams and Deputy Roberts monitored defendant's cell after hearing a loud shout from the unit in which he was housed. They overheard part of a conversation between defendant and his cellmate, Charles Hansen. Defendant said that he was not the one who opened the car door, that the girl was. His cellmate asked, "This girl?" and defendant said something to the effect: "No, the one I murdered." Defendant said, "They say they have my fingerprints on the car door, but they don't because she opened the car door. I didn't." He also said that Fisher was a witness for the prosecution and that he would kill Fisher or have his brother kill him.

For his part, defendant introduced evidence as follows. He testified concerning the incident involving Suzanne H. to this effect. He was not having a good time at the bars with her and Camp; she seemed to be "checking out the chicks." After they dropped off Camp, he told her about a party on Arnold Road. She insisted she knew the way, but took the wrong roads despite his initial attempts to direct her. She stopped at the end of an isolated road. She told him he could give her a birthday kiss. As they kissed, she moved his hand to her breast. She told him she was a lesbian but wanted

to see men again. He was disgusted; he spit on her and told her to take him back to his truck. She asked to go to a motel with him; he told her he did not go out with lesbians. They drove to a gas station. After he pumped the gasoline, he told her he wanted to go. When she did not respond, he grabbed her wrist and said "Let's go." She began screaming "rape." He asked what was going on, and she called him a "dick." He walked over to her car, pulled the coil wire, and walked away.

Defendant testified concerning the Holman incident to this effect. After leaving the gas station, he attempted to call a friend or a cab to pick him up; he also asked several people for a ride. As he stood in front of a supermarket, he smoked a marijuana cigarette. A "big fat man," whom he identified as Emanuel Manson, approached and accepted a "hit" of marijuana. He asked Manson for a ride, offering him money. Manson told him that the driver of a car that was pulling up would probably give him a ride. Manson went into the supermarket.

A "girl," later identified as Holman, got out of the car Manson referred to. Defendant told her "that guy" had said she would probably give him a ride to Ventura. She said "wait a minute" and went into the supermarket. Manson came out of the supermarket and stood by his car. Holman came out of the supermarket and said, "Okay, let's go." She opened the door for defendant. Manson also got into his car and drove off first. Holman drove to a bank on the corner and parked next to Manson. She spoke to him, asking, "Where's Ashley?" Manson told her that Ashley had gone to the shop and would meet her at the corner of Wooley Road and Victoria. Defendant and Holman smoked another "joint" and then drove away at the same time as Manson.

Holman parked at the appointed corner for approximately 30 to 40 minutes. She told him she was "scoring blow." They smoked another "joint." He told her he had been out with a lesbian and had spit on her. She told him she was not a lesbian and said she wanted to have sex. He said no, and she replied, "I know you are not a goody-good." She orally copulated him and they had sexual intercourse. As far as he knew they had "normal," i.e., vaginal, intercourse.

After sexual intercourse Holman asked if defendant had cocaine. He told her that he did not use cocaine. At that point, there was pounding on the window. Defendant looked out and recognized Myron Ashley Reid. He had seen Reid previously doing business with a drug dealer named "Marietta," for whom defendant had worked as a "muscle man," i.e., guard. Reid was wearing a blue jogging suit. He was accompanied by a man with shoulder-length dirty-blond hair. Defendant did not recognize the "white guy," but Holman said he was her "boyfriend's friend."

Reid shouted, "You fucking bitch. You couldn't wait, could you? You knew I was coming." Holman and defendant got out of the car. Reid told defendant to get into the car that had just pulled up and that he would be taken where he wanted to go. Manson was driving the car. Defendant smoked marijuana with Manson, as Holman, Reid, and the "white man" got into Holman's car, with Reid driving. Reid was yelling at Holman, calling her "fucking bitch" and asking "what the fuck do you think you're doing." He then drove off. Manson followed.

Reid and Holman were arguing in the car; the "white man" also argued. Manson was surprised by the direction Reid drove, commenting that they were supposed to go to "Pit's house." He followed Reid to a golf course. He saw the door open and Holman hanging out from the waist down. The car hit a telephone pole. Manson stopped and defendant jumped out of the car. Manson and the "white man" left Holman's car. Defendant ran to Holman, who was lying on the ground. He heard Reid say, "She pulled a fucking knife on me." Holman was conscious; she told defendant she was all broken up inside and urged, "Run, run, he has a gun." He saw that Manson had a stick like a baseball bat in his hand. He picked Holman up, slung her across his shoulder and ran across the golf course, followed by the "white man." Defendant slipped and fell. When he got up, the "white man" was "right there," and told him that "Ashley" wanted to talk to him. He left Holman with the "white man" and walked back to the car, where Reid stood with a revolver in his hand. Defendant kicked the gun from Reid's hand, kicked him in the chest, and ran off toward some railway tracks. He saw bright lights like the headlights of a car; after that, he "got hit." The next thing he knew, he was lying across the railway tracks and an old man with a beard, long hair, and "scraggly" clothes was slapping him in the face. He pushed the man away and "took off." He returned to his truck and drove off. He did not contact the police because "I figured they all knew each other. It wasn't my business." He did not know Holman was dead.

The next day, a man approached defendant at work with a message from Reid: "If anything happens, anybody come to you, you wasn't there, you didn't see nothing, and you're not saying nothing, and we got you covered."

Defendant was interviewed by police concerning the incident involving Suzanne H. He told them that after he was stopped by the Port Hueneme police for urinating, he was picked up by someone in a tan Comet and taken to his truck in Ventura, where he sat in his truck and drank. At trial, he testified that he lied to the police because of threats to himself and his family.

Defendant testified that he had followed warnings not to talk to possible informants. He admitted telling Fisher that he "fucked up" but denied saying

anything about killing anyone. He testified that Moreno asked him, "Didn't you fuck her after she was dead?" He replied, "Get the fuck out of here, you fucking rat."

Defendant also presented expert testimony concerning the ways in which in-custody informants can obtain information and use it against other inmates in exchange for privileges. Defendant presented evidence to show that Fisher and Moreno had motives to testify falsely as "snitches." He also presented evidence to cast doubt on the credibility of Deputies Adams and Roberts, including expert testimony that police deputies in jail were usually on their first assignments and eager to distinguish themselves by helping in important cases.

Defendant introduced evidence that Holman had a cocaine habit. A witness who had known Holman since high school testified that, on one occasion at Holman's house, a drug dealer named "Audie" threatened Holman and her boyfriend that he would kill them if they "didn't quit messing around." A drug dealer testified that she called him often, continuing even after he refused to sell her any more drugs. On the weekend of her death, he was not home but received a message from Holman. Holman's aunt testified that a week before the murder she discovered Holman using cocaine.

Defendant also presented evidence concerning Reid to corroborate third party culpability. Vargas testified that, before Holman entered the supermarket, a Black man in a dark blue jogging suit had been in the store; the man was 5 feet 10 or 11 inches tall, weighed 155 or 160 pounds, and was about 30 years old.

Reid denied defendant's testimony that he was involved in the Holman incident, testifying that he was at home with his girlfriend on the evening of August 27. His girlfriend confirmed his alibi. Both Reid and his girlfriend also testified that he does not own a blue jogging suit. Reid was 25 years old, 5 feet 11½ inches tall, and weighed 180 pounds.

Reid admitted that he was involved in cocaine dealing. Defendant presented testimony concerning an incident in April 1990, in which Reid forcibly drove off with a woman and threatened her with a knife. Reid lost control of the car and she was able to jump out.

Defendant also presented testimony concerning Holman's former boyfriend, Steve Cramer, but could not positively identify him as "the white man" who accompanied Reid. A week before the murder, Cramer told Holman's mother that someone should "kick Holman's ass." On the Friday

before the murder, they argued over the telephone and he threatened to come over and "kick [the] ass" of a friend who was with her. Defendant also presented testimony concerning an incident in the summer of 1988, in which Cramer chased Holman on a beach, tripped, and landed with his hands pressing her throat.

Cramer testified he was with his brother at home on the night of the murder; his brother corroborated the alibi.

## B. *Penalty Phase*

The People presented a case in aggravation that focused on other instances of criminal activity involving force or violence.

On several occasions, defendant used violence toward his first wife, Laura King. In May 1983, shortly after their first separation, he pushed her, slapped her several times, and forced her back into her apartment. He then drove off with their daughter, over King's protests.

In the summer of 1983, defendant put a telephone cord around King's neck and tried to choke her. Another time, he held her up against a wooden fence and choked her with both hands until she experienced "tunnel vision." She fell and he dragged her across the gravel, ripping her skin and clothes. A friend of King's chased him off with a crowbar. Sometime after Christmas 1983, defendant pushed her down a flight of stairs.

In February 1984, after they separated for the last time, defendant came to King's home and accused her of sleeping with Brian Engblom, who rented a room from her. He insisted that he wanted to take their daughter, who was in his wife's arms. As they argued and struggled, and while she was holding their daughter, King fell down the stairs.

When Engblom returned, defendant pushed him and said he wanted to "settle" something. He pulled out a knife and slashed at Engblom, ripping his coat.

In November 1987, defendant confronted Ricardo Brown in the presence of two other men, accusing him of making accusations about defendant's second wife, Leticia Hernandez. Defendant was holding something about three feet long that was wrapped in a sheet or bag. Brown denied saying anything about Hernandez and told defendant to go away. Defendant kicked Brown hard in the buttocks and said he was going to kill him. Brown said he would go into his apartment and get a gun to defend himself. Defendant

pulled a samurai sword from the bag or sheet and threatened to kill Brown. He chased Brown, lunging and swinging the sword at him several times. Brown grabbed a metal dolly and blocked the sword. The two men referred to above grabbed defendant. Police arrived and confiscated the samurai sword. Defendant was charged with misdemeanor battery (Pen. Code, § 242) and brandishing (*id.*, § 417). He pleaded no contest to the former and was convicted of the latter offense.

In mitigation, defendant introduced evidence relating to his background and character. He presented testimony of his family members, including his mother, father, and sisters. He was the third of six children. His father was in the Navy and his family moved around the country according to his father's assignments. His parents divorced when he was six or seven. His mother remarried twice; his father also remarried. The children did not hear from their father after the divorce because the mother withheld letters from him to the children and forbade contact with him.

The family was financially stable. Defendant's mother worked as a government employee and was involved in civic activities. Although she attended and supported defendant's sports activities, she "really turned her back on the family in the most important areas." She was physically abusive to her daughters and admitted she was not close to defendant.

Defendant was brought before the juvenile court for a theft offense while in his junior year of high school. At the same time, his sister was on juvenile probation. A psychologist who evaluated defendant during that time reported that he was of normal intelligence, but uncooperative and displayed a poor attitude toward authority. Testing at that time showed that he found his home rigid and cold. A psychologist concluded that his mother and stepfather were directly responsible for his delinquency and that of his sister. He recommended counseling, which did not take place.

After a year in youth camp, defendant returned home for about a year. He moved out after an argument with his mother. He lived with a friend, Danny Williams, and with Williams's family for three years. Jacqueline Williams testified that defendant was like a son to her; he was solicitous and helpful, called her "Mom," and said he loved her. Once, when he was picked up on a traffic warrant, she called defendant's mother; his mother wanted nothing to do with him.

Defendant also studied Kenpo karate beginning at the age of 17. His instructor testified that he came to the studio daily. He had great physical abilities and became one of the best students, making good progress toward

a blue belt. He was a fierce competitor, but played by the rules. His instructor also testified that Kenpo karate included training with a samurai sword, to develop coordination.

A friend from high school testified that defendant was never belligerent and did not use karate to intimidate others. He did not believe defendant was a "cold-blooded, heartless person or killer."

While he was living with the Williams family, defendant resumed contact with his father and stepmother. He also met Laura King, whom he married. Before the breakup of their marriage, he worked steadily in the oil fields in a physically demanding job and was promoted. He was a good provider, loved his daughter, and shared in child care responsibilities. He testified that the marriage broke up because he wanted King to stay home with the child.

At one point, defendant took his daughter, over King's objections, to live at the home of his father and stepmother. He did not tell King where their daughter was. After about six months, defendant's father told King where the daughter was living. King began weekend visits with the daughter and eventually took and failed to return the daughter. Defendant was unable to find his daughter and has had no contact with her since that time.

King admitted that she sometimes deliberately provoked defendant and knew how to "push his buttons." She also admitted that the incident in which defendant slashed at Engblom with a knife may have started because she had been late on an occasion when defendant was supposed to pick up their daughter.

A probation officer who prepared a report on defendant after the May 1983 spousal battery incident noted that the controversy was over child custody. She reported that the actions of both defendant and King contributed to the situation. She did not recommend the case for diversion, but only because of defendant's prior record, which included prior convictions for vandalism and receiving stolen property, failure to appear for traffic matters as a juvenile, and a misdemeanor battery adjudication.

A psychiatrist, William Vicary, M.D., testified that there were five principal mitigating factors weighing against a penalty of death. First, defendant had a traumatic family background and unsuccessful relationships with his two wives. Second, he had serious psychological problems, including "antisocial personality disorder." He also exhibited some of the characteristics of "mania," such as being hot-headed. He had attempted suicide. He had a tendency to express his distress in somatic disorders. Since the guilt verdict,

he suffered from a "hysterical conversion disorder," believing that he was paralyzed. Third, he had a history of drug abuse, including marijuana, cocaine, amphetamines, and alcohol, which exacerbated his psychological condition. Fourth, he was generally a passive and subdued personality who tended to bottle up his problems. Incidents of violence tended to be explosions under pressure. Fifth, he was remorseful; tears came into his eyes when he spoke of Holman. He said, "[I]t shouldn't have happened. She was an innocent person. Instead, it should have happened to someone like me."

Dr. Vicary also testified that defendant had positive attributes for adjusting to prison life. Although he had an antisocial personality disorder, he did well when provided with structure and sympathy. Dr. Vicary expressed the view that defendant would have problems in the Department of Corrections for the first several months but that he could be treated successfully for his psychiatric disorder. Eventually, he might serve as a trusty or teacher's aide.

Dr. Vicary testified that, in the period before the crime, defendant was "coming to the end of his rope, slowly but surely." He fought with his second wife, Leticia, on the night of the murder; she threw him out and said she wished he was dead. On his date with Suzanne H., he smoke and drank; when he "came on" to her, she tricked and humiliated him. Dr. Vicary testified that he believed defendant attempted to rape Holman and exploded in anger when she fought back. Holman was dark in coloring like his two wives.

On cross-examination, Dr. Vicary testified: "I accept and respect the verdict of the jurors and I have studied thousands of pages in this case and I am personally convinced that he's responsible for the death of the victim." He also testified that there were several aggravating factors in the case. First, the crime was senseless and cruel, including sexual assault just before or after Holman's death. Second, there were two serious crimes within a few hours. Third, defendant's in-custody statements to informants showed he was callous about the murder. Fourth, defendant had a prior criminal history of assaultive outbursts. Fifth, he had chances to turn his life around, including his relationship with the Williams family and his karate instructor, but did not take advantage of those opportunities.

Dr. Vicary was shown a letter from an inmate named "Streeter" describing a conversation in which Streeter told defendant "everyone says you killed her because she looked like your wife. Did you thought [sic] it was your wife you were strangling? [Defendant] said[,] 'Yeah, it should have been.'" The note indicated that defendant laughed. Dr. Vicary testified that the note was consistent with his conclusion that defendant felt deep hatred for his first

wife and would have preferred to strangle her in place of Holman. When asked whether the information, if accurate, would be inconsistent with remorse, Dr. Vicary testified: "To some extent."

## II. GUILT ISSUES

Defendant raises a number of claims attacking the judgment as to guilt. As will appear, none is meritorious.

### A. *Other-crimes Evidence Concerning Reid*

At trial, defendant sought to introduce evidence of other crimes committed by Myron Ashley Reid to corroborate a defense of third party culpability in the murder of Holman. His offer of proof, based on Evidence Code section 1101, included evidence that Reid previously engaged in an act of forcible group sex at a party where he was furnishing cocaine and had previously offered to trade sex for cocaine. The trial court concluded that the proffered evidence did not exhibit sufficient similarities to the events related by defendant to establish Reid's motive, intent, or identity. Instead, it found that the evidence of prior acts constituted character evidence, showing Reid's propensity to engage in the kind of activity alleged to have resulted in Holman's death. Accordingly, it ruled that the evidence was inadmissible under Evidence Code section 1101.

■ Defendant contends that the trial court erred by barring the proffered evidence. He urges that the evidence of Reid's prior violence toward women and cocaine-related activity tended to corroborate his claim that Reid, not defendant, was responsible for the murder. He proposes that Evidence Code section 1101 should apply only to exclude inculpatory evidence of other crimes committed by a *defendant*, not evidence concerning a third party's culpability. Thus, evidence showing a character trait or disposition to commit such acts should be admissible to prove a third party's conduct on a specific occasion.

The claim is meritless.

Evidence Code section 1101 provides, in relevant part: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity . . .) other than his or her disposition to commit such act."

Nothing on the face of the statute limits its application to evidence concerning a defendant. A "person" under the provision is *any* person, whether or not a defendant. If the Legislature intended the statute to apply only to evidence of "other crimes" by a defendant, it could have so provided.

Nor does the case law support the argument that the statute is limited to evidence concerning a defendant. In *People* v. *Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99], we clarified the standard for admission of evidence that a third party is guilty of the charged offense. *Hall* disapproved the judicially created heightened standard of relevancy for third party culpability evidence, holding that it should be treated like any other evidence. (*Id.* at pp. 831-834.) Under *Hall*, evidence of third party culpability must be capable of raising a reasonable doubt of the defendant's guilt; "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Id.* at p. 833.)

*Hall* did not abrogate Evidence Code section 1101 as applied to such evidence. Subsequently, in *People* v. *Farmer* (1989) 47 Cal.3d 888 [254 Cal.Rptr. 508, 765 P.2d 940], we specifically addressed the application of Evidence Code section 1101 to proposed evidence regarding prior criminal conduct of a third party alleged to have committed the charged offense. The defendant in *Farmer* offered evidence of a third party's history of violent crime, on the theory that it tended to identify him as the perpetrator. We noted that under *Hall*, evidence linking a third person to the actual perpetration of the crime should be treated like any other evidence. (*Id.* at p. 921.) We went on to hold, however, that the proffered evidence was properly excluded under Evidence Code section 1101, because it was offered not to show a fact other than the third party's criminal disposition, such as motive or intent, but merely to show that the third party was the more likely perpetrator because he had a history of violence. (47 Cal.3d at p. 921) Such evidence does not amount to direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

Here, as in *Farmer*, the proposed evidence did not relate to motive and intent but was essentially an attempt to show that Reid was more likely to have been the killer because he had a history of violence. Moreover, there was *no* evidence supporting defendant's testimony that Holman knew Reid or that Reid was present when Holman was assaulted. It was therefore properly excluded.[1]

---

[1]Defendant claims the exclusion of the evidence was error not only under the Evidence Code, but also in violation of the cruel and unusual punishment clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment. At trial, defendant

## B. *Impeachment of Manson and Reid*

At trial, defendant did not seek to impeach Reid with evidence of other crimes. He did, however, seek to impeach Manson with a misdemeanor conviction for knowingly giving false information to a police officer in connection with a traffic ticket. (Veh. Code, § 40000.5.) The trial court ruled that the evidence of the conviction was inadmissible. Defendant did not seek to impeach Manson with evidence of the underlying misdemeanor conduct.

■ Defendant claims error, on the ground that he should have been permitted to introduce evidence of specific conduct to impeach the credibility of a witness. He argues that his failure to make an offer of proof at trial should be excused because the admissibility of the evidence became clear only under *People* v. *Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938], which he could not have anticipated.[2] Alternatively, he claims ineffective assistance of counsel under the Sixth Amendment, on the basis that it was professionally unreasonable not to make an offer of proof of the evidence.

Defendant cannot claim error in excluding evidence he did not seek to introduce. There was no exclusion and therefore no error by the trial court. Defendant asks us to posit that he *would have* attempted to introduce the evidence, that the prosecution *would have* objected to the evidence as irrelevant and/or inadmissible under Evidence Code section 352, and that the trial court erroneously *would have* sustained the objection. This chain of events is merely hypothetical. Even if there had been error, there would be no prejudice in light of the relatively minor probative value of the excluded evidence.[3]

■ The alternative claim of ineffective assistance of counsel also fails.

failed to make any argument whatever based on federal constitutional provisions. He may not do so now for the first time on appeal. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1264-1265 [270 Cal.Rptr. 451, 792 P.2d 251].) In any event, the exclusion of this evidence did not substantially implicate any of the cited federal constitutional provisions.

[2]In *Wheeler*, we addressed the admissibility under California Constitution, article I, section 28, subdivision (f), of misdemeanor conduct to impeach a witness. The majority held, as a matter of first impression after passage of Proposition 8, that "[w]hile the trial court may weigh proffered impeachment evidence on its individual merit, there is no basis for a ruling that the court's discretion may never be exercised to admit nonfelonious conduct." (*People* v. *Wheeler*, *supra*, 4 Cal.4th at p. 296.) The outcome in *Wheeler* was not readily foreseeable. (See *id.* at pp. 302-305 (dis. opn. of Mosk, J.).)

[3]Indeed, even under *Wheeler* it is not a foregone conclusion that the evidence, if challenged, would have been ruled admissible: "Of course, the admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude section 352 allows for exclusion of impeachment in individual cases is broad." (*People* v. *Wheeler*, *supra*, 4 Cal.4th at p. 296, fn. omitted.) The evidence of Manson's alleged false statement when receiving a traffic ticket was, at best, only marginally

■ "Under . . . the Sixth Amendment to the United States Constitution . . . a criminal defendant has the right to assistance of counsel. [Citations.] The ultimate purpose of this right is to protect the fundamental right to a trial that is both fair in its conduct and reliable in its result. [Citations.] [¶] Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839], italics in original.) A defendant claiming ineffective assistance of counsel must first establish that "counsel's representation fell below an objective standard of reasonableness." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052].) He must then establish prejudice: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [¶] . . . [¶] . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at pp. 693-694 [80 L.Ed.2d at pp. 697-698]; *People* v. *Ledesma*, *supra*, 43 Cal.3d at pp. 215-218.)

■ As defendant concedes, his counsel could reasonably have believed, before our holding in *Wheeler*, that evidence of Manson's underlying misdemeanor conduct and Reid's unadjudicated other crimes was inadmissible for impeachment purposes. Accordingly, he fails to establish that his "counsel's representation fell below an objective standard of reasonableness." (*Strickland* v. *Washington*, *supra*, 466 U.S. at pp. 688, 694 [80 L.Ed.2d at pp. 693, 697-698]; *People* v. *Ledesma*, *supra*, 43 Cal.3d at pp. 215-218.)[4]

### C. *Cross-examination Regarding Informants*

■ Defendant cross-examined Deputy James Adams, Michael Fisher, and Fernando Moreno concerning his alleged in-custody admissions. He claims that the trial court erred in limiting his ability to impeach these witnesses.

---

probative but likely to be prejudicial. Similarly, evidence of Reid's uncharged prior conduct had little tendency in reason to suggest his lack of credibility as a witness, yet its introduction was likely to prove time consuming and confusing to the jury.

[4]Defendant also argues that even if we reject his ineffective assistance claim, we must find that failure to admit the evidence was a violation of the confrontation clause of the Sixth Amendment, the cruel and unusual punishment clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment. We are unpersuaded. It is speculative whether counsel would have attempted to introduce the evidence or, as discussed, whether it would have been admitted. In any event, in light of the limited probative value of the evidence at issue, we conclude beyond a reasonable doubt that its admission would not have affected the outcome of the case.

As shown below, the claims are unpersuasive.

### 1. *Deputy Adams*

Deputy Adams testified on direct examination that, during a security check of defendant's cell, he overheard defendant's incriminating remarks to his cellmate, Charles Hansen. On cross-examination, defendant asked him whether "as a jailer, as a guard there, [he] would be aware of people who are known to be informants" and whether he had "information to believe that Mr. Hansen was a known informant to police." The prosecutor objected to both questions on relevance and hearsay grounds; the trial court sustained the objections. Defendant made no contemporaneous offer of proof as to the relevance of the questions. He now speculates that Deputy Adams's responses might have had some impeachment value.

The claim lacks merit. On this record, the trial court's ruling, even if erroneous, could not have prejudiced defendant because any favorable inference he sought to draw from the proposed impeachment was purely speculative.

### 2. *Fisher*

Fisher testified that defendant made incriminating statements when he was first booked into jail. During cross-examination, defendant asked Fisher what significance, if any, the reputation of "having a snitch jacket"—being an informant—would have for other inmates. The trial court sustained the prosecution's objection to the question on relevance grounds. After defendant's offer of proof, the trial court informed defendant that questions concerning Fisher's attempts to seek favorable treatment were relevant, but that defendant was attempting to elicit the information "by way of a very circular route." The trial court specifically invited defendant to ask Fisher direct questions about fear of being returned to prison and whether he sought intervention from the district attorney in exchange for his testimony. Defendant did not do so.

The claim of error fails. The trial court properly ruled that the question, as posed, did not seek relevant evidence. The record also establishes that defendant was not improperly restricted in his cross-examination of Fisher.

### 3. *Moreno*

Moreno testified that he acted as an informant in part to earn a release from custody to attend the birth of his second child. During cross-examination, defendant asked Moreno, "Where were you on the first one, when he

was born?" The prosecution's objection, on relevancy grounds, was sustained.

Defendant made an offer of proof that Moreno may have missed the first birth for selfish motives and may have been "shooting up" or in jail. The trial court ruled such testimony was irrelevant.

Defendant's claim of error fails. He was not precluded from questioning Moreno about his furlough to attend the birth of his second child in exchange for testifying against him. The jury was fully informed concerning possible bias or motive to fabricate. The trial court properly ruled that the testimony sought by defendant concerning the birth of his *first* child was irrelevant.[5]

### D. *Prosecutorial Misconduct Regarding Plea Agreement*

At trial, the prosecutor read into the record a memorandum of the plea agreement with Moreno, stating, in substance, that Moreno would testify in exchange for benefits, including a furlough to attend the birth of his child. The memorandum recited that the plea agreement was "[b]ased on our interview with Fernando Moreno, careful consideration of his prospective testimony, and belief that the information he has provided is truthful and accurate." It also stated, "Should there be any issue as to whether he testified truthfully to the best of his ability, it would be submitted to and resolved by the trial judge in the Larry Davis case . . . ." There was no contemporaneous objection.

Later in the trial, defendant objected to the phrase referring to "belief" that the information provided was "truthful and accurate." The trial court struck that portion of the memorandum and admonished the jury that beliefs of the parties are not relevant and do not constitute evidence.

Defendant concedes that he has waived any claim of prosecutorial misconduct by failing to make a timely objection. (See *People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) ■ "It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion"—and on the same ground—"he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People* v. *Benson* (1990) 52

---

[5]Defendant also asserts perfunctory claims to the effect that the combined effect of these alleged errors implicated the confrontation clause of the Sixth Amendment, the cruel and unusual punishment clause of the Eight Amendment, and the due process clause of the Fourteenth Amendment. There were no such errors and there was no such effect.

Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330].) "It is true that the rule does not apply when the harm could not have been cured." (*Ibid.*) That is not the case here; any purported harm was certainly curable.

■ In the alternative, defendant asserts ineffective assistance of counsel. The claim is meritless. The trial court's admonition cured any potential harm or prejudice as to the portion of the memorandum referring to Moreno's credibility.[6] As to the portion of the memorandum referring to resolution of "any issue as to whether [Moreno] testified truthfully to the best of his ability," defendant's claim of ineffective assistance of counsel is unpersuasive. Even if he could establish that his counsel's performance was deficient, he fails to establish prejudice.

The jury could not reasonably have understood Moreno's plea agreement to relieve it of the duty to decide, in the course of reaching its verdict, whether his testimony was truthful. (See *People* v. *Fauber*, *supra*, 2 Cal.4th at p. 823.) Additionally, the trial court instructed the jury that they were "the sole judges of the believability of a witness and the weight to be given the testimony of each witness." Defendant thus fails to carry his burden of establishing a reasonable probability that but for his counsel's alleged deficient performance, the result of the proceedings would have been different.[7]

### E. *Prosecutorial Misconduct Regarding Fisher Testimony*

During closing argument, the prosecutor referred to Fisher's testimony that defendant said, "I think I might have broken someone's neck and I'm looking at probably seven years." He commented : "And you may wonder why he said '7 years,' but you may recall that in prior time that was commonly known as the minimum time for which you could—." At that point, the remark was cut off by defendant's objection to introduction of evidence outside the record. The trial court sustained the objection and admonished the jury to disregard the comment.

---

[6]As in *Fauber*: "The prosecutor argued for [Moreno's] credibility based on the evidence adduced at trial, not on the strength of extrajudicial information obliquely referred to in the plea agreement. Moreover, common sense suggests that the jury will usually assume—without being told—that the prosecutor has at some point interviewed [Moreno] and found his testimony believable, else he would not be testifying." (*People* v. *Fauber*, *supra*, 2 Cal.4th at p. 822.)

[7]Defendant also claims that the prosecutor's misconduct implicated the confrontation clause of the Sixth Amendment, the cruel and unusual punishment clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment. He merely recasts his state law claim under constitutional labels. For the reasons addressed in the text, any error was cured or harmless beyond a reasonable doubt.

██ Defendant claims that the prosecutor's partial statement had the effect of vouching for the credibility of Fisher's testimony and violated his right to confront witnesses.

The claim is meritless. As defendant concedes, the incomplete remark by the prosecution was merely inchoate; no reasonable juror would have understood it to bolster Fisher's credibility or to refer in a meaningful way to any specific facts outside the record. In any event, any possible harm was cured by the trial court's prompt instruction to the jury that there was no evidence to support the comment and they must disregard it.[8]

### F. Denial of Motion to Sever

Before trial, defendant moved to sever the trial for the offenses against Suzanne H. from those involving Holman. The trial court denied the motion.

██ Defendant claims error, arguing that it was clear when he made the motion that the prosecution aimed to bolster two otherwise weak cases against defendant by presenting the charges and evidence in a single trial. Specifically, the prosecutor would be aided in establishing intent to sodomize Holman if he could present the charges and evidence concerning the sexual assault against Suzanne H. Defendant argues that, at the very least, the determination of the special circumstance of commission or attempted commission of sodomy against Holman must be reversed.

Additionally, defendant claims that even if the trial court's ruling was correct at the time it was made, he was denied his right to due process under the Fourteenth Amendment in the course of the trial because the joinder prejudiced his ability to raise a defense of third party culpability. On this separate ground he seeks reversal of the guilt determination.

The claims are lacking in merit.

██ Two or more different offenses can be tried together "provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ." (Pen. Code, § 954.)

---

[8]Defendant also asserts that the prosecutor's misconduct violated the confrontation clause of the Sixth Amendment, the cruel and unusual punishment clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment. The claims are waived by defendant's failure to make an assignment of error on that basis in the trial court. (*People* v. *Benson, supra,* 52 Cal.3d at p. 794.) In any event, none of these constitutional provisions was substantially implicated by the incomplete remark.

Refusal to sever on a defendant's motion might be an abuse of discretion where "(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all; and (4) any one of the charges carries the death penalty." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 173 [222 Cal.Rptr. 184, 711 P.2d 480]; see also *Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 639 [257 Cal.Rptr. 550, 770 P.2d 1119].)

On appeal, we examine the ruling on the record in which it was made. (*People* v. *Balderas*, *supra*, 41 Cal.3d at p. 171.) "The burden of demonstrating that . . . denial of severance was a prejudicial abuse of discretion is upon him who asserts it . . . ." (*Ibid.*) A party seeking severance must "clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (*Frank* v. *Superior Court*, *supra*, 48 Cal.3d at p. 640.)

 Defendant fails to carry his substantial burden. No abuse appears.

As defendant concedes, the evidence in support of the offenses against Holman and Suzanne H. was cross-admissible on the issues of identity and intent. (Evid. Code, § 1101, subd. (b).) As the trial court properly concluded, the close proximity in time and place of the two incidents, and the similarities between them, strongly supported joinder. On that ground alone, there was no abuse of discretion. (See *Frank* v. *Superior Court*, *supra*, 48 Cal.3d at p. 639 ["the first criterion—cross-admissibility—can be dispositive when it is determined that the charged crimes would be cross-admissible at separate trials"].)

The trial court also addressed the remaining factors under *Balderas*, properly ruling that, on balance, a joint trial was appropriate. Thus, it considered that while "factor number 4 [the presence of a death penalty charge] . . . weighs heavily in the defendant's favor," "these are not inflammatory offenses as defined or as set forth in the cases," and "[a]s far as the relative strengths and weakness of the case, . . . I don't see here a strong case being supported by a weak case or being bootstrapped up by a weak case."

The alternative claim of due process violation also fails. A determination of guilt must be reversed despite a correct joinder ruling by the trial court only if "a gross unfairness has occurred from the joinder such

as to deprive the defendant of a fair trial or due process of the law." (*People v. Johnson* (1988) 47 Cal.3d 576, 590 [253 Cal.Rptr. 710, 764 P.2d 1087].)

The charge of assault on Suzanne H. with intent to commit sodomy and/or rape was supported by credible evidence, including the testimony of the victim, and the jury found it true. (See discussion below in pt. II.G.) There was also substantial evidence linking defendant with the murder and sexual assault of Holman. Although the extensive cross-admissible evidence on the issues of intent and identity doubtless undercut defendant's theory of third party culpability in the Holman murder, no gross unfairness resulted from joinder to deprive him of a fair trial or due process of law.

### G. *Sufficiency of Evidence of Intent to Commit Rape and/or Sodomy*

Defendant claims that the evidence was insufficient to support the conviction of assault with intent to commit rape and/or sodomy on Suzanne H. At most, he asserts, he engaged in "an overly forcible seduction that perhaps crossed the line of sexual battery but did not go farther." The claim is meritless.

In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], italics in original.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) We " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1237 [278 Cal.Rptr. 640, 805 P.2d 899].)

"The essential element of [assault with intent to commit rape] is the intent to commit the act against the will of the complainant. The offense is complete if at any moment during the assault the accused intends to use whatever force may be required." (*People* v. *Meichtry* (1951) 37 Cal.2d 385, 388-389 [231 P.2d 847].) The same, we believe, is true of assault with intent to commit sodomy. "[I]f there is evidence of the former intent and acts attendant to the execution of that intent, the abandonment of that intent before consummation of the act will not erase the felonious nature of

the assault." (*People* v. *Soto* (1977) 74 Cal.App.3d 267, 278-279 [141 Cal.Rptr. 343].)

■■■ Defendant argues unpersuasively that the incident with Suzanne H. had the "earmarks of a conventional date" and "at most showed an overly forcible seduction that perhaps crossed the line of sexual battery but did not go farther." The record includes substantial evidence from which a rational trier of fact could infer intent to commit rape and/or sodomy.

Thus, Suzanne H. testified that defendant directed her to drive to an unfamiliar and isolated area, pulled the keys from the ignition, and aggressively fondled her breasts and crotch in spite of her protests. When she opened the car door and attempted to leave, he forcibly prevented her from doing so. Only through the ruse of feigning acquiescence to have sexual intercourse with him in a motel room was she able to convince him to let her drive the car. She pulled into a gas station, asked him to pump gas, and immediately sought assistance from the cashier and another customer. When she did not return to the car, defendant grabbed her under the arms and dragged her back toward the car. After she screamed, resisted and eluded his grasp, he disabled her car and fled.

H. *Sufficiency of Evidence of Premeditation and Deliberation for First Degree Murder*

■■■ Defendant asserts that there was insufficient evidence to sustain a conviction for murder in the first degree of Holman. The claim is meritless. As discussed, in reviewing sufficiency of the evidence, we must determine, in light of the whole record whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (See *Jackson* v. *Virginia*, *supra*, 443 U.S. at p. 319 [61 L.Ed.2d at pp. 573-574].)

The specific issue concerns the elements of premeditation and deliberation. Defendant argues that there was insufficient evidence of planning or an exacting manner of killing. He is unpersuasive.

The evidence of the manner in which Holman was murdered was sufficient to support a finding of premeditation and deliberation. The evidence showed that Holman, gravely injured after her car struck a pole, fled from defendant. He pursued her and then strangled her over a period of *up to five minutes*, at a time when she was severely debilitated and in pain from internal injuries. A rational finder of fact could infer that defendant's manner of killing Holman demonstrated a deliberate plan to kill her.

Defendant argues that the evidence does not satisfy the test for sufficiency of the evidence under *People* v. *Anderson* (1968) 70 Cal.2d 15, 26 [73

Cal.Rptr. 550, 447 P.2d 942]. Even were that the case, in *People* v. *Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159], we emphasized that the categories identified in *Anderson* are descriptive, not normative. "The goal of *Anderson* was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*Ibid.*; but see *id.* at pp. 1134-1147 (dis. opn. of Mosk, J.); *id.* at p. 1147 (dis. opn. of Kennard, J.).)

## I. *Use of Special Findings*

Over defendant's objection, the jury was instructed as follows: "You have been instructed on deliberate and premeditated first degree murder and felony first degree murder. In order to reach a verdict of first degree murder it is not necessary that all jurors agree on which of the two theories applies so long as all jurors agree that at least one of them has been proved beyond a reasonable doubt; however, it is required that you make special findings should you return a verdict of first degree murder as to whether the jury unanimously did in fact agree on either or both theories." The jury indicated that it unanimously found premeditation and deliberation but did not unanimously find felony-murder rape.

▇▇ Defendant claims that the use of special findings was prejudicial error, because it interfered with the jury's deliberative process. The claim fails.

"A general verdict on a plea of not guilty is either 'guilty' or 'not guilty' . . . ." (Pen. Code, § 1151.) "A special verdict is that by which the jury finds the facts only, leaving the judgment to the court." (*Id.*, § 1152.) In a criminal trial, except in certain circumstances inapplicable here, a jury must render a general verdict. (*Id.*, § 1150.)

Although not explicitly authorized by statute, special findings like those required in the present case are a valid "hybrid form of general verdict" consistent with the Penal Code provisions. (*People* v. *Neely* (1993) 6 Cal.4th 877, 898 [26 Cal.Rptr.2d 189, 864 P.2d 460].) "[S]pecial 'findings' may accompany a general criminal verdict, even if not expressly authorized by statute, so long as they do not interfere with the jury's deliberative process." (*People* v. *Webster* (1991) 54 Cal.3d 411, 447 [285 Cal.Rptr. 31, 814 P.2d 1273]; see also *People* v. *Farmer*, *supra*, 47 Cal.3d 888, 920 [special findings did not violate defendant's right to trial by jury and due process].)

Defendant fails to identify any improper interference with the jury's deliberative process. As in *Farmer*, the jury was required to answer special

questions only if it determined that defendant was guilty, not as a condition precedent to a general verdict. (*People* v. *Farmer*, *supra*, 47 Cal.3d at p. 920.) The instruction was not ambiguous on this point: the court conveyed to the jury with ample clarity that it was required to make the special finding only *after* it had deliberated on the issue of guilt.

Defendant contends that even if the jury properly understood the instruction, "[n]o juror could possibly feel free *not* to return a general verdict of guilt for first degree murder, if forced to declare publicly that he has found the factual predicate for first degree murder true." The argument is unpersuasive. No particular findings were required *unless* the jury concluded that defendant committed murder in the first degree; if the jury returned a verdict of not guilty, it would not be forced to declare publicly anything apart from that general verdict. The jury was not compelled either directly or by implication to find murder in the first degree: it was free to return that verdict, but equally free to return a verdict of not guilty.[9]

### J. First Degree Felony-murder Rape

As discussed above, in pretrial proceedings, on a motion under Penal Code section 995, the trial court dismissed the charges of attempted rape and assault to commit rape in the Holman incident, as well as the special circumstance of felony-murder rape. Prior to opening statements, the prosecutor informed defendant and the trial court that he would nonetheless seek to present evidence on first degree felony murder with the underlying felony of attempted rape. Defendant acknowledged, "I have notice," but objected on statutory and due process grounds. The trial court ruled that it would permit an instruction on felony-murder rape if the prosecution produced evidence in support of that theory.

Subsequently, the prosecution filed a written motion in support of using attempted rape as a basis for a theory of felony murder. It specifically alleged new evidence from a vaginal swab taken from Holman, indicating possible sexual intercourse with defendant. Defendant opposed the motion. The trial court ruled that the prosecution would be allowed to introduce evidence related to the rape or attempted rape of Holman. It further indicated that, if the evidence presented supported an instruction on felony murder, such instruction would be given.

At trial, the prosecution presented evidence on the issue of rape or attempted rape. Inter alia, Moreno testified that defendant told him he had

---

[9]Defendant also asserts that the error violated the impartial jury clause of the Sixth Amendment and due process clause of the Fourteenth Amendment of the United States Constitution, and under article I, section 16 of the California Constitution. There was no error. The use of special findings did not substantially implicate these constitutional provisions.

both vaginal and anal intercourse with Holman; defendant testified that he believed he had vaginal sex with Holman; and two experts testified that forensic tests indicated that Holman may have been raped as well as sodomized.

During the settling of instructions, the trial court ruled that there was sufficient evidence to warrant instructing the jury on felony murder based on rape or attempted rape. As discussed above, the jury returned special findings stating that it unanimously found premeditation and deliberation; it did not unanimously find felony-murder rape.

■ Defendant claims error and violation of the due process clause of the Fourteenth Amendment, on the ground that he received inadequate notice that the jury would be permitted to consider the theory of felony-murder rape. He insists, unpersuasively, that he had "every reason to believe" the rape theory was precluded by the results of the Penal Code section 995 hearing and that he was not informed until the end of the trial that the jury would be instructed on felony-murder rape.

The claims fail. Under the circumstances of this case, notice was adequate. Defendant was informed from the beginning of trial that, despite the ruling on the Penal Code section 995 motion, the prosecutor might attempt to prove the charge by showing that the murder was committed in perpetration of a felony. The trial court expressly ruled that it would permit evidence on the issue and informed defendant that it would instruct the jury on felony-murder rape if it determined that the evidence was sufficient to support such a theory. During the trial, evidence of attempted rape and rape was presented. Defendant made no request for a continuance on the basis that notice was inadequate. Nor has defendant persuasively explained how the defense strategy was significantly affected by the addition of the felony-murder rape theory. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 188-189 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 751, fn. 11 [175 Cal.Rptr. 738, 631 P.2d 446].)

Defendant's reliance on *Sheppard* v. *Rees* (9th Cir. 1990) 909 F.2d 1234 is therefore misplaced. In *Sheppard*, the United States Court of Appeals for the Ninth Circuit granted habeas corpus relief on the ground that the defendant had received constitutionally inadequate notice of the prosecution's felony-murder theory. The court stressed that "[a]t no time during pretrial proceedings, opening statements, or the taking of testimony was the concept of felony-murder raised, directly or indirectly." (*Id.* at p. 1235.)

Here, as defendant concedes, he was informed early in the trial and thereafter that the prosecution intended to pursue a felony-murder theory and

the trial court would instruct on that theory if it found sufficient evidence. He may not complain of surprise or "ambush." There was no error or due process violation.

■■■ Defendant argues that even if he had adequate notice, the trial court erred. He contends that without a proper commitment order, it lacked jurisdiction to hear the case on a theory of felony-murder rape. He further maintains that a decision on a pretrial motion under Penal Code section 995 is "supposed to be final"; the trial court, after dismissing charges of rape and attempted rape, lacked jurisdiction to "rehear" those charges at trial under a theory of felony-murder rape.

His jurisdictional claims lack merit. There was a proper commitment order from the municipal court naming the charge of murder; jurisdiction in the trial court was therefore established. Second, in ruling on the Penal Code section 995 motion, the trial court found sufficient evidence to support the murder charge; it made no factual finding concerning the *theories* that could support the charge, including the theory of felony-murder rape. It therefore retained jurisdiction to hear the murder charge on a theory of felony-murder rape.

A similar claim was recently rejected in *People* v. *Bernard* (1994) 27 Cal.App.4th 458 [32 Cal.Rptr.2d 486]. In that case, the defendant had successfully moved under Penal Code section 995 to set aside the information as to the special circumstance of felony-murder kidnapping. Although the charge was dismissed, the jury was subsequently instructed on theories of felony-murder kidnapping and felony-murder kidnapping for robbery. As the Court of Appeal properly concluded, "it is not necessary to separately charge a defendant with either a felony-murder theory or the underlying felony. Felony murder and premeditated murder are not distinct crimes; rather, they constitute 'two kinds of first degree murder' requiring different elements of proof." (27 Cal.App.4th at p. 470.)

Defendant urges that "something like collateral estoppel or res judicata" ought to operate in this case to preclude the use of a felony-murder rape as a theory of first degree murder after formal charges of rape are dismissed. The argument is unpersuasive. Dismissal of the felony-murder rape special circumstance constituted no bar under any of the principles defendant suggests—whether double jeopardy, res judicata, or collateral estoppel.[10]

---

[10]Double jeopardy precludes reprosecution for an offense of which a defendant has been acquitted or to which jeopardy has otherwise attached. Res judicata gives conclusive effect to a final judgment on the merits in subsequent litigation of the same controversy. Collateral

### K. *Prosecutorial Misconduct in Referring to Sodomy as Underlying Felony*

During voir dire of one prospective juror, defendant gave forcible sodomy as an example of an underlying felony that would support a conviction for first degree felony murder. The prosecution, too, used sodomy, attempted sodomy, and kidnapping as examples of underlying felonies, during voir dire of the same prospective juror and one additional prospective juror. Defendant did not interpose any objection.

The trial court subsequently informed counsel outside the presence of the prospective jurors that neither forcible sodomy nor kidnapping were enumerated felonies in Penal Code section 189 and therefore could not support a first degree felony-murder conviction.[11] From that point on, neither counsel nor the trial court referred to forcible sodomy or kidnapping as predicate felonies for first degree murder. As discussed above, the jury was instructed on alternate theories of premeditation and deliberation and felony-murder rape.

■■■ Defendant asserts prosecutorial misconduct, or, if that claim is not cognizable, ineffective assistance of counsel.

By his failure to make an assignment of misconduct in a timely fashion at trial, defendant waived his claim on appeal of prosecutorial misconduct. (*People* v. *Benson, supra,* 52 Cal.3d at p. 794.) In any event, no misconduct is shown, not merely because the prosecutor's misstatement was apparently

---

estoppel bars relitigation of an issue decided in a previous proceeding in a different cause of action if "(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; and (2) the previous proceeding resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior proceeding." (*People* v. *Meredith* (1992) 11 Cal.App.4th 1548, 1556 [15 Cal.Rptr.2d 285]; see also *People* v. *Santamaria* (1994) 8 Cal.4th 903, 910-913 [35 Cal.Rptr.2d 624, 884 P.2d 81].) None of the requirements for any of these doctrines is satisfied here. Neither the magistrate at the preliminary hearing nor the judge at the pretrial Penal Code section 995 hearing made any factual findings with respect to the dismissed counts of rape, attempted rape, or special-circumstance felony-murder rape. Indeed, as defendant concedes, the prosecution was free, among other options, to reinstate the dismissed charges (Pen. Code, § 871.5) or amend the complaint. Dismissal of the charges put defendant in the same position he would have been in if they had not been filed. The absence of the rape-related charges did not preclude the trial court from instructing the jury on any theory of murder, including felony murder.

[11]At the time defendant committed the murder of Holman, Penal Code section 189 did not specify sodomy and kidnapping as predicate felonies for first degree felony murder. The offenses were added to the list of predicate felonies on June 6, 1990, pursuant to Proposition 115. The new provisions do not apply to crimes committed before the measure's effective date, which is June 6, 1990. (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 286, 298-299 [279 Cal.Rptr. 592, 807 P.2d 434].)

merely inadvertent, but because there was no conceivable prejudice. " 'What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant.' " (*People* v. *Clair* (1992) 2 Cal.4th 629, 661 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

Defendant also fails to establish ineffective assistance of counsel. Even if he could show that counsel's representation "fell below an objective standard of reasonableness," he fails to demonstrate prejudice. (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 688, 694 [80 L.Ed.2d at pp. 693-694, 697-698]; *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 215-218.)

The trial court gave full and complete instructions to the jury on the two alternate theories of first degree murder—premeditation and deliberation and felony-murder rape. It expressly instructed that the felony-murder rule applied only if the jury found beyond a reasonable doubt that defendant committed or attempted to commit forcible *rape.* It further instructed that an unlawful killing that occurs during, or as a direct result of, the commission or attempted commission of sodomy and/or kidnapping is murder of the *second* degree. In addition, it instructed that, if anything said by the attorneys at any time during the trial conflicted with its instructions on the law, the jury was required to follow the instructions.

Defendant urges that the jury might nonetheless have been confused because it was also instructed—albeit correctly—that forcible sodomy and attempted forcible sodomy were the bases for one of the special circumstances. He argues that precisely because of the "welter" of instructions, there was a danger that the jury would be unable to distinguish between felony murder as a special circumstance and felony murder as a theory of first degree murder.

The argument is unpersuasive. In addition to the detailed instructions discussed above, the jury was instructed as follows. "Ladies and gentlemen, *if you find* the defendant in this case guilty of murder of the first degree *you must then determine* [that] one or more of the following special circumstances are true or not true." (Italics added.) The special findings similarly made it clear to the jury that its verdict concerning first degree murder was separate from, and preceded, its findings as to the special circumstance.[12]

### L. *Instruction on Kidnapping*

The trial court gave the jury the following standard instruction on consent in relation to the kidnapping charge: "When one consents to accompany

---

[12]Defendant also asserts that the prosecutor's misconduct resulted in a violation of the due process clause of the Fourteenth Amendment and the cruel and unusual punishment clause of the Eighth Amendment. The claims are meritless; in light of the clear instructions by the trial court, the constitutional provisions are not substantially implicated.

another there is no kidnapping so long as such condition of consent exists. To consent to an act or transaction a person must, one, act freely and voluntarily and not under the influence of threats, force or duress; two, *have knowledge of the true nature of the act or transaction involved*; and, three, possess sufficient mental capacity to make an intelligent choice whether or not to do something proposed by another person." (Italics added.)

On the ground that the foregoing adequately covered the elements of consent to kidnapping, the trial court rejected the proffered defense special instruction No. 36, which stated as follows. "When one, in the exercise of his own free will and *with knowledge of what is taking place with respect to his person*, voluntarily and willingly consents to accompany another, the latter cannot be guilty of kidnapping the former so long as the condition of consent exists." (Italics added.)

██ Defendant claims error. He argues that the jury might have been misled by the language in the standard instruction to believe that consent in kidnapping may be vitiated by fraud, deceit, or dissimulation for the purpose of the asportation.[13] As a consequence, it might have found that the kidnapping began as early as when defendant entered Holman's car at the supermarket. He also asserts that the trial court erred in refusing his proposed instruction, because, unlike the instruction given, it more clearly signifies that what the alleged victim must know is that she is being "physically moved."

There was no error. Although the instruction, CALJIC No. 9.56, is not well-worded, it correctly states the law. It does not declare or suggest that fraud, deceit, or dissimulation vitiate consent. The phrase "act or transaction," which appears twice in the instruction, refers to the earlier phrase "to accompany another." Thus "knowledge of the true nature of the act or transaction involved" refers to the act or transaction of accompanying another, i.e., physical asportation.

Moreover, the trial court gave additional instructions that correctly informed the jury that the "knowledge of the true nature of the act or transaction" referred to the victim's knowledge that she was being physically moved. The jury was instructed: "It is not necessary, in order to constitute kidnapping, that the victim be forcefully abducted. If all of the other elements, as I have defined them, are proven beyond a reasonable doubt, a kidnapping may occur where the victim *initially voluntarily went somewhere*

---

[13]As we held in *People* v. *Green* (1980) 27 Cal.3d 1, 64 [164 Cal.Rptr. 1, 609 P.2d 468], asportation by fraud alone does not constitute general kidnapping in California. " '[A] general act of kidnapping . . . can only be accomplished by the use or threat of force.' "

*with the defendant or voluntarily permitted him to go somewhere with her, but thereafter she was transported after being forcibly restrained from leaving."* (Italics added.) The trial court did not err in rejecting defendant's proffered instruction.

Additionally, the prosecutor's closing argument did not suggest that the kidnapping commenced at the supermarket through fraud, deceit, or deception. As defendant concedes, "the prosecution's theory of kidnapping was that defendant, in the course of a consensual asportation, applied force to Holman and thereby transformed the event into a kidnapping from that point on." Defendant, indeed, expressly emphasized in closing argument that the prosecutor had urged that the kidnapping commenced, not at the supermarket, but when Holman tried to leave the moving car. Accordingly, there was no reasonable likelihood that the jury would have understood the instruction in the manner suggested by defendant. (*People* v. *Clair, supra,* 2 Cal.4th 629, 662-663.)[14]

### M. *Instructions on Kidnapping and Sodomy Special Circumstances*

The jury was instructed as follows. "To find that the special circumstance, referred to in these instructions as murder in the commission or attempted commission of sodomy and/or kidnapping, is true, it must be proved, one, that the murder was committed while the defendant was engaged in the commission or attempted commission of sodomy and/or kidnapping; two, the murder was committed in order to carry out or advance the commission of the crime of kidnapping and/or sodomy or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the kidnapping and/or sodomy was merely incidental to the commission of the murder." As discussed above, the jury found true the special circumstances of felony-murder kidnapping and felony-murder sodomy.

■■■ Defendant claims error, on the ground that the instruction improperly failed to invoke "specific intent." He contends that to find special circumstances of felony-murder kidnapping and felony-murder sodomy true, the jury must determine that there was "specific intent," even though sodomy and kidnapping are "general intent" crimes.[15] He is unpersuasive.

Penal Code section 190.4, subdivision (a), provides in relevant part: "Whenever special circumstances as enumerated in Section 190.2 are alleged

---

[14]Defendant also contends that the trial court's error violated the due process clause of the Fourteenth Amendment and the cruel and unusual punishment clause of the Eighth Amendment. He essentially restates, using constitutional labels, his unpersuasive state law claim. There was no error.

[15]A crime is characterized as a "general intent" crime when the required mental state entails only an intent to do the act that causes the harm; a crime is characterized as a "specific intent"

and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance . . . . [¶] . . . Whenever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime."

This provision is clear and controlling. Under the general law, kidnapping and sodomy are characterized as "general intent" crimes. (*People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], overruled on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].) Accordingly, the trial court properly instructed the jury.

We have never held that "specific intent" is required for the felony-murder special circumstance.[16] We see no reason to do so now. Certainly, the requirement of "specific intent" is not necessary to "provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not." (*People* v. *Green, supra,* 27 Cal.3d 1, 61, fn. omitted; cf. *Tison* v. *Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676] [holding that the Eighth Amendment does not prohibit the death penalty as disproportionate in the case of a defendant whose participation in a felony that results in murder is major and whose mental state is one of reckless indifference].)[17]

---

crime when the required mental state entails an intent to cause the resulting harm. (See *People* v. *Hood* (1969) 1 Cal.3d 444, 456-457 [82 Cal.Rptr. 618, 462 P.2d 370].) "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intent is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some future act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*Id.* at pp. 456-457.) As to the sodomy special circumstance, the jury found *attempted* sodomy. It was properly instructed that an attempt requires "specific intent" to commit the crime. (CALJIC Nos. 2.02, 3.31, 6.00.)

[16]Defendant cites *People* v. *Proctor* (1992) 4 Cal.4th 499 [15 Cal.Rptr.2d 340, 842 P.2d 1100] for the proposition that "specific intent" is required for the felony-murder rape special circumstance. *Proctor* correctly holds that "the rape-murder special circumstance was properly found to have been proved if it was established that defendant intended to commit rape, and the rape and the killing were part of one continuous transaction." (*Id.* at p. 536.) In discussing the facts, it states in dictum that "a rational trier of fact could have found that defendant possessed the specific intent to commit rape." (*Ibid.*) On its face it does not *require* such a finding. It should not be read to do so.

[17]In *People* v. *Green, supra,* 27 Cal.3d at page 61, we held that the felony-murder special circumstance requires that the defendant must commit the act resulting in death "in order to advance an independent felonious purpose." That means only that he must not perpetrate the underlying felony as "merely incidental to the murder." (*Ibid.*) It does *not* mean that he must act with "specific intent."

N. *Instruction on Reasonable Doubt*

The trial court gave the standard instruction on reasonable doubt, as follows. "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places on the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: it is not a mere possible doubt; because everything relating to human affairs, and depending on *moral evidence*, is open to some possible or imaginary doubt. Reasonable doubt is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say that they feel an *abiding conviction, to a moral certainty,* of the truth of the charge." (CALJIC No. 2.90.) The trial court also instructed: "If . . . one interpretation of [the circumstantial] evidence *appears* to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." (CALJIC No. 2.01, italics added.)

■■■ Defendant argues that the references to "moral certainty" and "abiding conviction" in CALJIC No. 2.90 were deficient because they allowed a finding of guilt with a lesser degree of proof than that required by the due process clause of the Fourteenth Amendment. He similarly objects to CALJIC No. 2.01, on the ground that the word "appears" dilutes the reasonable doubt standard and constitutes an impermissible conclusive presumption of guilt under the Fourteenth Amendment.

The claims fail. Although there has been strong criticism of CALJIC No. 2.90 by some members of the United States Supreme Court in *Victor* v. *Nebraska* (1994) __ U.S. __, __ [127 L.Ed.2d 583, 601-602, 114 S.Ct. 1239, 1252] (separate conc. opns. by Kennedy, J. and Ginsburg, J.), the court did not hold the instruction to violate the due process clause. (*Id.* at pp. __-__ [127 L.Ed.2d at pp. 591-599, 114 S.Ct. at pp. 1244-1249].) It held that the instruction, taken as a whole, correctly conveyed the concept of reasonable doubt. It expressly discussed the use of the phrases "moral evidence," "moral certainty," and "abiding conviction," finding that there was no reasonable likelihood that the jury understood these phrases to allow conviction on proof insufficient to meet the standards of due process.

While we believe a substantial modification of that instruction is desirable, we have nevertheless consistently upheld it against challenge. (See *People* v. *Freeman* (1994) 8 Cal.4th 450, 501-505 [34 Cal.Rptr.2d 558, 882 P.2d 249]; *id.* at pp. 525-526 (conc. opn. of Mosk, J.); *id.* at pp. 526-531

(conc. opn. of George, J.); *People* v. *Wilson* (1992) 3 Cal.4th 926, 942-943 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People* v. *Jennings* (1991) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009].)[18] In short, though the instruction does not violate the due process clause, it can be improved by the Legislature. (*People* v. *Brigham* (1979) 25 Cal.3d 283, 292-316 [157 Cal.Rptr. 905, 599 P.2d 100] (conc. opn. of Mosk, J.).)

Moreover, as we held in *Wilson*: "a reasonable juror would understand that, taken in context, the relevant language of CALJIC 2.01 . . . must be considered in conjunction with the 'reasonable doubt' standard [CALJIC 2.90]. Thus, the jury properly can find the prosecution's theory as to the interpretation of the circumstantial evidence 'reasonable' and alternative theories favorable to the defense 'unreasonable,' within the meaning of these instructions, only if the jury is convinced beyond a reasonable doubt of the accuracy of the prosecution's theory. . . . Accordingly, when the instructions are viewed as a whole, the disputed language does not undermine the instructions on the presumption of innocence and the standard of proof beyond a reasonable doubt, and does not impermissibly create a mandatory conclusive presumption of guilt." (*People* v. *Wilson, supra*, 3 Cal.4th at p. 943.) Here, similarly there was no violation of due process.[19]

## O. *Response to Question From Jury*

During deliberations, the jury submitted the following question to the trial court. "Special circumstance of sodomy under Count 1, if the victim were dead when the sodomy occurred, would the defendant be guilty?" The foreman added: "[T]he question on virtually all of the counts, all these related to sodomy is the question of whether she was dead or alive at the time. It seems to come down to that. That is what we are hung up on. Because whether—whether we can prove one way or the other, dead or alive at the time makes a big difference the way we read it." The trial court referred the jury to several instructions.[20]

Defendant contends that the trial court erred by failing, sua sponte, to redirect the jury to the instruction regarding the specific intent element of

---

[18]In *Jennings* we rejected the argument that the use of the word "appears" dilutes the reasonable doubt standard: "The plain meaning of these instructions merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt. No reasonable juror would have interpreted these instructions to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt." (*People* v. *Jennings, supra*, 53 Cal.3d at p. 386.)

[19]Defendant also includes a perfunctory claim that the instructions violated his "right to trial by jury." He merely restates the due process claim under a different label; the same result adheres.

[20]Specifically, the jury was referred to an instruction that if it found defendant guilty of first degree murder, it must then determine whether one or more of the following special circumstances was true: (1) the murder was committed while defendant was engaged in

attempted sodomy. He argues that the jury might have been confused because the instruction on assault, also given previously, stated that an element of assault is that "[t]he person making the attempt had a general criminal intent." In the alternative, he claims ineffective assistance of counsel.

The claim of error fails. Where, as here, "the original instructions are themselves full and complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].) The trial court properly exercised its discretion. With the participation of counsel, it redirected the jury to those instructions it determined would clarify the issues. The jury did not articulate any confusion on specific intent as applied to the offense of attempted sodomy. The court could reasonably have declined to instruct further on the issue.

The claim of ineffective assistance of counsel also fails. Counsel did not ask that the jury be referred to any additional instructions. His conduct was reasonable. The jury's question did not indicate that it was having difficulty with the concept of specific intent as it related to the offense of attempted sodomy. Defendant therefore fails to establish that "counsel's representation

---

commission or attempted commission of sodomy by force; or (2) the murder was committed while defendant was engaged in the commission or attempted commission of kidnapping. It was also referred to the instruction: "The defendant in this case is charged with forcible sodomy as well as a special circumstance of murder in the commission or attempted commission of forcible sodomy. [¶] If you should find that no anal penetration occurred until after death, the defendant cannot be found guilty of forcible sodomy but could be found guilty of the lesser included offense of attempted sodomy if the evidence shows, beyond a reasonable doubt, that the defendant attempted an act of forcible sodomy while the victim was still alive. [¶] Similarly, the allegation of a special circumstance, that the killing occurred during the commission or attempted commission of forcible sodomy, should be found true if, and only if, you are satisfied beyond a reasonable doubt that the defendant either: (1) had an act of forcible sodomy with the victim before her death; or (2) attempted to have an act of forcible sodomy with the victim while she was alive . . . . As a matter of law, a rape or sodomy cannot occur if the victim is deceased." Finally, it was referred to the instruction: "You may not find the special circumstance of forcible sodomy to be true, nor the charge of forcible sodomy to be true, nor may you find that [the] underlying felonies of forcible sodomy or rape support a finding of guilty murder if you find the victim was already deceased at the time of said sexual activity. This instruction should be considered in connection with those instructions heretofore given on circumstantial evidence." The instructions correctly state the applicable law. (See *People* v. *Kelly* (1992) 1 Cal.4th 495, 524-528 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

fell below an objective standard of reasonableness." (*Strickland* v. *Washington, supra,* 466 U.S. 668, 688, 694 [80 L.Ed.2d 674, 693-694, 697-698]; *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 215-218.)[21]

### P. *Motion for New Trial*

After the close of the guilt phase, defendant brought a motion for a new trial, based, inter alia, on the sufficiency of the evidence to support first degree murder on a theory of premeditation and deliberation, attempted robbery, and kidnapping. The trial court denied the motion.

Defendant claims error, pointing to certain statements by the court that he argues indicate use of an improper standard of review. Thus, on the issue of premeditation and deliberation, defendant quotes the trial court as stating: "The Jury did reach a result and the question is: Is the result that they reached supported by the circumstantial evidence and inferences that could be made or are those inferences also really not inferences and the Jury just speculated because they thought they didn't like the defendant, they thought it was a horrendous crime." On the kidnapping and sodomy charges, defendant quotes the trial court as stating: "the court feels there was sufficient evidence to support the verdicts on those counts." It also stated, in reference to the kidnapping charge: "And I think the evidence supports that, and I think the jury finding of that supported by the evidence, and some, of course, leaving premeditation and deliberation aside, I think that the Court or jury was adequately instructed as to all of the law that applied to the case. [¶] I think that the jury applied the law to the facts and I am not at this time prepared to set aside any of the conclusions that they made as to counts 3—strike that counts 2 and 3."

Defendant contends that these statements show that the trial court's exclusive focus was on evidence sufficient to support the *jury's* finding, not on independent review of the evidence. He claims that the trial court erred by examining the evidence under an incorrect standard of review, in violation of Penal Code section 1181, subdivision 6.

The claim is meritless. Penal Code section 1181, subdivision 6, in relevant part provides: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial . . . [¶] . . . [¶] [w]hen the verdict or finding is contrary to law or evidence . . . ."

In reviewing a motion for a new trial, the trial court must weigh the evidence independently. (*People* v. *Serrato* (1973) 9 Cal.3d 753, 761 [109

---

[21]Defendant also claims the error resulted in violation of the due process clause of the Fourteenth Amendment. There was no error; the instructions were correct and the jury indicated no confusion. Accordingly, defendant's due process claim falls.

Cal.Rptr. 65, 512 P.2d 289].) It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. (*People v. Martin* (1970) 2 Cal.3d 822, 832 [87 Cal.Rptr. 709, 471 P.2d 29].) The trial court "should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict." (*People v. Robarge* (1953) 41 Cal.2d 628, 633 [262 P.2d 14].)

A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " (*People v. Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221].)

 No such abuse appears here. The record establishes that, after considering the motion for a new trial, in which it expressly articulated the correct standard of review, the trial court independently determined the credibility of the witnesses and the probative value of the evidence. Although defendant isolates statements in which the trial court refers to the jury's verdicts, it is clear from the record as a whole that it did not regard itself as bound by any of the jury's findings.

Thus, on the issue of premeditation and deliberation, the trial court discussed the evidence in some detail and offered what were clearly its own independent conclusions: "[I]n the Court's view there was strong evidence regarding the manner of the killing to support premeditation and deliberation . . . . I also think that there is also evidence of planning and motive . . . . I think that the evidence supports the finding or the inference that planning occurred or could well have occurred and I would support a jury finding that it did also. I think the events earlier in the evening would support motive." Similarly, on the kidnapping and sodomy counts, the trial court concluded: "there was sufficient evidence to support the verdict on those counts . . . . [t]he jury was instructed that the crime of kidnapping could be committed if the movement was consensual at first and but later turned into something less than consensual. And I think the evidence supports that, and I think the jury finding of that [was] supported by the evidence."[22]

---

[22]Defendant also attempts to restate his claim of error as a violation of the Fourteenth Amendment, arguing that although entitlement to independent review is not itself a constitutional right, it creates a "liberty interest." He is unpersuasive. Even if such a "liberty interest" could theoretically be implicated by a violation of the requirements under Penal Code section 1181, there was no such violation in this case.

### III. Penalty Issues

Defendant raises a number of claims attacking the judgment as to penalty. As will appear, none is meritorious.

#### A. *Guilt Phase Errors*

Defendant claims that he was prejudiced at the penalty phase by trial court errors at the guilt phase. Specifically, he claims ineffective assistance of counsel with regard to the plea agreement with Moreno; improper denial of his motion to sever; improper submission of a felony-murder theory of first degree murder; and a faulty instruction on reasonable doubt.

The claim fails. Because we have rejected each of the claims of error (see discussion above at pts. II.D.; II.F.; II.J.; II.L.), no prejudice is shown.

#### B. *Failure to Conduct Hearing on Competency*

After the guilt verdicts were returned, defense counsel reported that defendant had a "severe and serious behavior problem": "My client is convinced and he has taken the attitude he has been railroaded and he's very angry and about to speak out in open court." At a hearing the following week, defendant appeared in a wheelchair. His counsel reported that, after the guilt verdicts were rendered, defendant was beaten by sheriff's deputies. Counsel stated: "I think the court needs to know that because Mr. Davis is in a mental state both as a result of the jury's findings in this case and as a result of what I think has been long-term treatment in the Ventura County Jail where [*sic*] I don't think he is going to be any longer able to cooperate with his counsel in the conduct of his defense."

A few days later, the trial court conducted a hearing outside defendant's presence concerning the allegations of mistreatment. Medical examination of defendant had been "negative" except for indications that he was suffering some back pain. Defendant's counsel noted that defendant was afraid of jail personnel and refused in two recent instances to talk with him, adding, "If he keeps in that mental state, we may be talking about [Penal Code section] 1368 [competency] proceedings." During the course of the hearing, the trial court remarked: "I have someone who is in an emotional state; I have someone who is convicted of first-degree murder with a special circumstance and looking at life imprisonment without parole at best. Frankly, I think the reactions to that, his reactions to that, are somewhat on the normal side."

At a subsequent prepenalty-phase hearing, defendant was initially unwilling to be present in the courtroom. His counsel explained: "I think his mental

status is such that he does not want to be here." The prosecutor stressed that "there is a significant difference between inabilities to cooperate and simply refusal or unwillingness to. It seems to me right now all we really have is the latter. There's been no psychiatric evidence that he is incompetent. I don't think he is incompetent." Eventually, defendant appeared in the courtroom with his counsel for the hearing.

At the beginning of the penalty phase, defendant remained in the doorway of the courtroom. The trial court told the jury: "[Defendant] preferred, like you, not to have his picture on television."

Subsequently, the trial court, outside the presence of the jury, stated his preference that defendant sit at the counsel table; defendant continued to insist on remaining in the doorway, near his counsel.[23] The trial court assented to defendant's request, stating: "Okay. I understand what you are saying and I think that you have understood what I have said and I guess for now—well, we'll just leave it at that." Counsel did not request a hearing on competency.

 Defendant contends that the trial court had a sua sponte duty to conduct a hearing on competence. In the alternative, defendant claims ineffective assistance of counsel, on the ground that his counsel invited error by projecting the possibility of a competency hearing in the future.

The claims fail. Under Penal Code section 1368, subdivision (a): "If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . ." At that point "all criminal proceedings must be suspended until a hearing has been conducted to determine whether the defendant is presently mentally competent." (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 91 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476].)

 It is clear from the record that no doubt arose in the mind of the trial court as to defendant's mental competence. Indeed, the trial court

---

[23]Defendant explained his decision not to be present in the courtroom as follows: "I don't like sitting here listening to lies about me . . . . I don't think I can sit here and have no problems with anybody in this courtroom listening to more, knowing that they know that they are lying and I know that they are lying. I feel if I sit over there, they will be less problems and I am happy to sit over there . . . . The problem is, how am I suppose to sit here like the lawyers say I'm suppose to have a straight face, don't show no, like I'm mad or anything. Just be straight and listen to these people what they have to say. It's been hard all through the trial to listen to these people when I know different . . . . I'm just trying to avoid problems."

expressed the view that defendant's apparent anger and upset over the guilt verdicts was "normal" under the circumstances. Counsel referred to the possibility of seeking a competency hearing at a *future* time if defendant's lack of cooperation did not improve; shortly thereafter, defendant became more cooperative and participated in the trial, albeit from the doorway.

The alternative claim of ineffective assistance of counsel also fails. We cannot conclude on this record that "counsel's representation fell below an objective standard of reasonableness." (*Strickland* v. *Washington*, *supra*, 466 U.S. at pp. 688, 694 [80 L.Ed.2d at pp. 693-694, 697-698]; *People* v. *Ledesma*, *supra*, 43 Cal.3d at pp. 215-218.) The record reflects that defendant's counsel could reasonably conclude that there were insufficient grounds to request a competency hearing.

(27b) " 'A defendant who, as a result of mental disorder or developmental disability[,] is "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner" is incompetent to stand trial. ([Pen. Code,] § 1367). When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial.' " (*People* v. *Danielson* (1992) 3 Cal.4th 691, 726 [13 Cal.Rptr.2d 1, 838 P.2d 729].)

Under the applicable substantial evidence test, "more is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense." (*People* v. *Laudermilk* (1967) 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228].)

The record does not offer substantial evidence of mental incompetence. Defendant's emotional and physical reaction to the guilt verdicts and possible mistreatment in jail did not demonstrate that he could not " 'understand the nature of the criminal proceedings or . . . assist counsel in the conduct of a defense in a rational manner.' " (*People* v. *Danielson*, *supra*, 3 Cal.4th at p. 726.)

Defendant's refusal to sit at the counsel table did not evince incompetence or lack of ability to participate meaningfully in the proceedings. His explanation for avoiding the counsel table was rational and coherent.[24]

## C. *Expert Psychiatric Testimony*

Defendant's psychiatric expert, Dr. Vicary, testified at the penalty phase that—on the basis of psychological testing, previous psychological reports, school and police reports, interviews with defendant, and interviews with defendant's family and friends—he believed there were numerous mitigating factors that weighed against the death penalty in this case.

On cross-examination, Dr. Vicary was questioned about defendant's score on the Minnesota Multiphasic Personality Inventory (MMPI), a standard psychological test. Dr. Vicary testified that defendant for the most part was in the normal range for mental conditions, but scored outside the normal range in the categories of "mania" and "psychopathic deviancy," indicating an antisocial personality disorder. Among the traits he identified as characteristic of an antisocial personality were repeated lying, repeated antisocial behavior, lack of strong empathy and remorse, and a tendency to blame others. He testified on redirect examination that although this personality disorder could not be "cured," it could be limited by appropriate intervention. He further testified that in his view the prison system was highly experienced and effective in providing such positive intervention.

■ Defendant asserts that, in light of this diagnosis, his counsel's decision to present Dr. Vicary as a witness was without any reasonable tactical grounds and was the product of inadequate preparation. He argues that the record shows a period of only five days from the time his counsel received Dr. Vicary's report until he testified—"too short a time" according to defendant. He further argues that the record shows the testimony was "unnecessary for the mitigating force of the defense evidence, and was harmful gratuitously." He claims ineffective assistance of counsel.

The claim is meritless. As discussed above, a defendant claiming ineffective assistance of counsel must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 688, 694 [80 L.Ed.2d at pp. 693-694, 697-698]; *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 215-218.)

---

[24]Defendant also asserts that the error resulted in a violation of the due process clause of the Fourteenth Amendment. As discussed, the record does not reflect that there were any grounds for requiring a competency hearing; his due process rights were not substantially implicated.

Defendant fails to establish deficient performance. Although counsel received the expert's written report only five days before he testified, we cannot conclude as a matter of law that this was "too short a time."

Defendant argues that in all events there could have been no sound tactical reason for calling Dr. Vicary as an expert witness; because his MMPI score indicated an antisocial personality disorder, he could only be harmed by psychiatric testimony that would disclose the results of the test. The argument is unpersuasive. We may readily infer such explanation from the testimony presented on direct examination: Dr. Vicary was uniquely able, as a psychiatric expert, to analyze information gathered from a wide variety of sources, including previous psychological reports, school records, and interviews with defendant's family, friends, and others, and present an opinion concerning those mitigating factors. Indeed, he provided considerable favorable testimony regarding factors in mitigation, including the only testimony presented to the jury that defendant showed remorse for the murder of Holman. He also provided the only testimony concerning defendant's adaptability to life in prison, testifying that in his opinion defendant would show "dramatic improvement" under the type of psychiatric treatment available within the prison system and could function positively in such a highly controlled setting, perhaps as a trusty or teacher's aide. Defendant does not show that there could have been no sound tactical reason to include such testimony.

### D. *Expert Testimony Regarding Note*

During cross-examination of Dr. Vicary, the prosecution sought to impeach the testimony in mitigation with a note from an informant named "Streeter," purportedly reporting a conversation with defendant about the murder of Holman. Defendant objected to the admission of the note on hearsay grounds and under Evidence Code section 352. The trial court asked Dr. Vicary whether he recalled seeing the note. Dr. Vicary responded that he had not seen it in reviewing the records but thought it was "significant" because "[i]t fits in with some of the thinking that went into my report. I would have included it." The trial court overruled the objections.

In the course of the cross-examination, the prosecutor asked Dr. Vicary to read a portion of the note to the jury: " '[E]veryone says you killed her because she looked like your wife. Did you thought [*sic*] it was your wife you were strangling? Larry said 'Yeah, it should have been.' Then they laugh.' " Dr. Vicary testified that the reported comment was consistent with his opinion that defendant had deep anger and hatred for his first wife and would have preferred to strangle her in place of Holman. The prosecutor

asked, "assuming that this information is accurate, [whether] a report that then they laughed would also be inconsistent with him having remorse for what he did to Dawn Holman?" Dr. Vicary responded, "To some extent." The note was not introduced into evidence.

■ Defendant contends that the trial court erred in admitting the evidence over his objections. He argues that the note should have been excluded as hearsay, but even if admissible to impeach Dr. Vicary's expert opinion, it should have been excluded under Evidence Code section 352 because its probative value was outweighed by the risk of improper use, as an admission of guilt.

The record shows that the note was not admitted into evidence. Accordingly, it was subject neither to the hearsay rule nor to Evidence Code section 352. The only issue is whether the prosecution could be permitted to cross-examine Dr. Vicary about the note for purposes of impeaching his expert testimony. The standard of review for such a determination is abuse of discretion. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 688 [286 Cal.Rptr. 801, 818 P.2d 84].)

Even assuming error in permitting cross-examination concerning the note, the claim fails in the absence of prejudice. The jury was on notice that the note was not necessarily accurate; the question posed by the prosecutor was a hypothetical one, whether, "assuming that this information is accurate," it would be inconsistent with defendant having remorse. The jury was also specifically instructed not to consider the information on which Dr. Vicary based his opinions "for the truth of the things that he read."[25] We presume jurors comprehend and accept the court's directions. (*People* v. *Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17.) Defendant's mere speculation that the jury might have disregarded the instruction is insufficient to overcome this presumption. There is no reasonable possibility that a more favorable outcome would have resulted if the trial court had precluded questioning about the note. The thrust of the prosecutor's questioning concerning the note was

---

[25]The trial court instructed the jury as follows: "Now, the doctor has testified to a lot of things he's read. He's testified to some things that people told him during the interview process. The evidence is admitted—that evidence is admitted for the purposes of the diagnosis or opinions that he has given and not to be considered by you for the truth of the things that he read or the truth of the things that were told to him." In addition, the trial court instructed that evidence admitted for a limited purpose could not be considered for any other purpose. (See *People* v. *Montiel* (1993) 5 Cal.4th 877, 919 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

to show that defendant hated King and would have liked to strangle her, not to show that he committed the underlying crime.[26]

### E. *Expert Testimony on Aggravating Factors*

In cross-examination, Dr. Vicary was asked to testify to his opinion concerning aggravating factors in the case.[27] He then testified, in substance, that the aggravating factors included the youth and innocence of the victim; the attempted rape of another woman just a few hours earlier; defendant's in-custody statements to other inmates, indicating callousness toward the crimes; his prior criminal history, and his failure to take advantage of opportunities to "turn his life around and go a different direction." He concluded, "So clearly, I mean, in this case, there are a series of aggravating factors that should be brought out, discussed and argued as well as a series of mitigating factors."

■ Defendant claims prosecutorial misconduct for eliciting inadmissible testimony concerning "non-statutory" aggravating factors—specifically, the youth and innocence of the victim and defendant's failure to "turn his life around" when given opportunities to do so. He also claims error by the trial court in failing to exclude the testimony. In the alternative, he claims ineffective assistance of counsel for failure to object expressly on relevance grounds and for suggesting by his jocularity that the evidence was "acceptable."

The claims of prosecutorial misconduct and trial court error are not cognizable. It is clear from the record that defendant's "objection" was offered as a humorous interjection, not as a serious legal challenge. By his failure to pose a serious, specific objection defendant waived a claim of prosecutorial misconduct or trial court error. (See *People* v. *Price, supra,* 1

---

[26]Defendant also asserts, for the first time on appeal, that the trial court violated the confrontation clause of the Sixth Amendment and the cruel and unusual punishment clause of the Eighth Amendment by admitting the evidence. We reject the point. "It is, of course, 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' " (*People* v. *Benson, supra,* 52 Cal.3d at p. 786, fn. 7, quoting *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) The point is also meritless, since the note was not in fact admitted into evidence. The constitutional provisions are not substantially implicated.

[27]Dr. Vicary was asked by the prosecutor: "Would you agree there are also aggravating factors in this case?" He responded, "There's no question about it . . . . In fact, if I try and testify on that, the district attorney usually jumps up and says, 'Objection, that's my job,' you see, that's why I'm forced to spend my time on mitigating factors." The prosecutor then asked him to "take ·a crack at the aggravating factors." Defense counsel interjected as follows: "Objection; that's his job." The transcript indicates laughter.

Cal.4th at pp. 447, 460.) In any event, no misconduct appears. The prosecution was entitled to impeach Dr. Vicary's opinion concerning mitigating factors.[28]

The alternative claim of ineffective assistance of counsel also lacks merit. Because the testimony was admissible, defendant does not establish that "counsel's representation fell below an objective standard of reasonableness." (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 688, 694 [80 L.Ed.2d at pp. 693-694, 697-698]; *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 215-218.) Moreover, counsel could reasonably conclude that interposing an objection or motion to strike Dr. Vicary's testimony, particularly about the innocence of the victim or defendant's failure to take advantage of opportunities to turn his life around—facts which would most likely appear obvious to the jury based on evidence from other sources—would undermine the jury's belief in the expert's credibility and objectivity.[29]

### F. Use of Samurai Sword Incident in Aggravation

During the penalty phase, the prosecution was permitted, over defendant's objection, to introduce in aggravation evidence of defendant's attack on Brown with a samurai sword. The incident, which occurred in 1987, resulted in charges of misdemeanor battery (Pen. Code, § 242) and misdemeanor brandishing of a weapon (Pen. Code, § 417). Defendant pleaded no contest to the latter and was convicted of it alone.

Defendant claims that presentation of evidence concerning the samurai sword incident violated his right to protection against double jeopardy. He further claims that his right to equal protection was violated because in a noncapital case, underlying facts of the conviction could not have been introduced for purposes of sentence enhancement. Finally, he claims that use of the underlying facts of the samurai sword incident

---

[28]Defendant incorrectly asserts that Dr. Vicary testified concerning factors in aggravation that are not included under Penal Code section 190.3, factors (a) through (k) and therefore were inadmissible. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) Holman's youth and innocence were relevant to factor (a), the circumstances of the crime. Defendant's failure to "turn his life around" was relevant to impeach Dr. Vicary's testimony about good character. Dr. Vicary had testified on direct examination to several positive relationships defendant established with friends and a teacher; the prosecution was entitled to elicit evidence that defendant did not take advantage of these relationships to "turn his life around." Because the testimony was not inadmissible, defendant cannot show that there is a reasonable probability that it would have been stricken by the trial court on counsel's motion.

[29]Defendant asserts perfunctory claims under the Sixth, Eighth, and Fourteenth Amendments based on the prosecutor's misconduct. The claims were waived by his failure to make an assignment of error based on the provisions. (*People* v. *Benson, supra,* 52 Cal.3d at p. 784.) In any event, there was no misconduct.

unconstitutionally led to an unreliable penalty determination because of the risk that the jury may have relied on stale evidence.

None of the constitutional claims, under the Fifth, Eighth, and Fourteenth Amendments, was raised in the trial court. In any event, the constitutional claims are meritless. Double jeopardy principles do not apply. "The presentation of evidence of past criminal conduct at a sentencing hearing does not place the defendant in jeopardy with respect to the past offenses. He is not on trial for the past offense, is not subject to conviction or punishment for the past offense, and may not claim either speedy trial or double jeopardy protection against introduction of such evidence." (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 71 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Melton* (1988) 44 Cal.3d 713, 756, fn. 17 [244 Cal.Rptr. 867, 750 P.2d 741].)

There was also no violation of equal protection. "It seems sufficient to observe that capital case sentencing involves wholly different considerations than ordinary criminal sentencing and properly allows the jury to focus on the defendant's prior criminal conduct and propensity for violence, factors deemed relevant as possible aggravating circumstances affecting the jury's ultimate penalty decision. [Citation.] This distinction between capital and noncapital cases adequately justifies the differences in treatment cited by defendant." (*People* v. *Danielson, supra,* 3 Cal.4th at p. 720.)

The claim of unreliable penalty determination due to consideration of "stale" evidence, too, fails. "We have consistently held that '[section 190.3, factor] *(b),* imposes *no* time limitation on the introduction of "violent crimes"; the jury presumably may consider criminal violence which has occurred at any time in the defendant's life. . . . [¶] . . . [Factor] (b) allows in *all* evidence of *violent* criminality to show defendant's propensity for violence.'" (*People* v. *Douglas* (1990) 50 Cal.3d 468, 529 [268 Cal.Rptr. 126, 788 P.2d 640], italics in original.)[30]

## G. *Exclusion of Docket Sheet*

Defendant sought to introduce the docket sheet of the 1987 criminal case involving the samurai sword incident as "an admission by the part of district attorney of the circumstances at the time was a 417 and not a 245"—i.e., that defendant's conduct warranted a charge of brandishing a deadly weapon (Pen. Code, § 417) but not of assault with a deadly weapon (*id.,* § 245). The prosecution objected that evidence was being offered to show the opinion of the charging deputy as to the seriousness of the conduct, and was therefore

---

[30]Moreover, the evidence at issue was not "stale": the samurai sword incident occurred only two years before defendant's 1989 trial.

inadmissible opinion. The trial court sustained the objection, stating "we don't know which district attorney did what and what information he had that led him to conclude that the case ought to be disposed of as a 417."

Defendant now claims that the trial court erred in excluding the evidence, because the docket sheet was admissible as a party admission by the People to show the *fact* of the charges brought and should in any event have been admitted as evidence in mitigation. He contends that he was entitled to present this admission in mitigation.

The claim fails. Since defendant did not rely on these theories below, he may not claim that the trial court erred in "rejecting" them.[31]

### H. *Inquiry Into Meeting Between Juror and Victim's Grandmother*

During the defense case in the penalty phase, the prosecutor informed the trial court that Juror Abbiatti had approached Shirley Phillips, Holman's grandmother. The following day, the trial court questioned Juror Abbiatti, with counsel present, outside the presence of the other jurors. She recounted: "She just told me it was her granddaughter that had been murdered and she had said what case I was on and I said just a murder case and she said was it the Larry Davis case and I said yes and she said it was her granddaughter and I said, 'I'm so sorry' and that's all I said." The trial court asked whether the conversation had any effect on her "ability to give both sides a fair trial or a fair deliberation." She responded, "Absolutely not. I wouldn't have gone all through this all this time and jeopardize it now." The trial court also questioned Phillips. She recounted essentially the same exchange, but added that Juror Abbiati had asked how Phillips's daughter was doing, to which she responded, "Well, she's been very devastated and had a hard time but she's coming along, she's working very hard on it." She added: "She never discussed the penalty part of the trial nor the guilt phase other than to express sympathy for my daughter."

---

[31]Defendant also claims that exclusion of the evidence resulted in a violation of his Sixth, Eighth and Fourteenth Amendment rights. The claims are waived by defendant's failure to present any argument below based on the provisions. (*People* v. *Gordon, supra,* 50 Cal.3d at pp. 1264-1265.) In any event, even if he had sought to include the evidence under his present theories, it is merely speculative that it would have been admitted. Evidence of prior violent conduct is admitted under Penal Code section 190.3, factor (b) "to enable the jury to make an individualized assessment of the character and history of the defendant to determine the nature of the punishment to be imposed." (*People* v. *Grant* (1988) 45 Cal.3d 829, 851 [248 Cal.Rptr. 444, 755 P.2d 894].) It is not the fact of the original charges, but the underlying conduct, that is probative. Moreover, in terms of its mitigating value, the trial court correctly concluded that it was merely speculative why the district attorney disposed of the case under Penal Code section 417. The constitutional provisions were not substantially implicated by exclusion of the evidence.

Defendant requested that Juror Abbiatti be excused. He also requested that she be asked whether she had discussed her encounter with anyone else. He agreed that if she stated that she had not, no further inquiry would be necessary.

Juror Abbiatti appeared before the trial court and stated that she remembered another remark by Phillips: "She said 'this has been awful hard on my daughter,' and I said 'Well' quoted [*sic*] 'I am sure it has and my heart aches for you.' And that is when the subject was closed." She told the trial court that two other jurors, Juror Baretta and Juror Vaughn, and "possibly another juror" were sitting on a bench "across the way." She said that there was no discussion with the other jurors.

The trial court excused Juror Abbiatti from the trial and instructed her not to discuss the matter with anyone. She agreed. The trial court subsequently instructed the other jurors not to speculate as to why she was no longer on the case or to contact her before the trial concluded. Later, one of the jurors wrote a note to the trial court stating, "I am having a lot of difficulty with the fact that [Juror Abbiatti] has been removed from the jury, especially without an explanation." At defendant's request, the trial court informed the jury that Juror Abbiatti had been excused because of her chance meeting with Holman's grandmother.

■■■ Defendant contends that the trial court erred because it conducted an inadequate inquiry. He argues that the trial court should have inquired whether other jurors, including Juror Baretta and Juror Vaughn witnessed the encounter and were affected by it.

Even if we were to conclude that defendant has not waived the claim by failing to demand further inquiry, it is lacking in merit.

" '[O]nce a court is put on notice of the possibility that improper or external influences are being brought to bear on a juror, it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and whether the impartiality of other jurors had been affected.' " (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1175 [270 Cal.Rptr. 286, 791 P.2d 965], italics omitted.)

The trial court did so here. After carefully questioning Juror Abbiatti and Phillips, including about their discussions with others, the trial court granted defendant's request to discharge Juror Abbiatti.

The record establishes that defendant agreed that no further inquiry was necessary. He now merely speculates that some other juror *might* have been

"tainted" by overhearing the conversation. Although other jurors were "across the way" during the conversation, there is no evidence that they were situated even within hearing distance; Juror Abbiatti informed the trial court that she did not discuss the matter with anyone else, including Jurors Baretta and Vaughn. No juror indicated any knowledge of the conversation; indeed, the trial court informed the jury why Juror Abbiatti had been discharged only after a juror had expressed "difficulty" with the lack of an explanation by the trial court.[32]

## I. *Prosecutorial Misconduct in Closing Argument*

Defendant claims separate instances of prosecutorial misconduct during closing argument, as follows.

### 1. *Lack of Remorse*

During his closing argument, the prosecutor told the jury that in determining the appropriate penalty, "to some extent I think you almost have to think of it as where does this crime stack up on a sort of a continuum of murders with special circumstances." He described several hypothetical examples to illustrate the "range of such crimes, some of which are much, much, much more aggravated than others." Thus, he offered the hypothetical case of a man whose wife and daughter had been raped by two escaped felons who he then tracked down and killed. He suggested: "[N]o D.A. in the state would ask for the death penalty in a case like that and if he did, no jury in this state would give it to him." He also offered the examples of two hypothetical robberies, one in which the defendant expresses remorse and the other in which the defendant boasts of killing his victim to make sure no witness can testify against him. He postulated that most people would not think the death penalty was warranted in the first case, but that the second case was "more serious" because it was "done in a cold blooded fashion and a person far from being remorseful and sorry and far from having done it in just the spur of the moment obviously intended to do that and to see that there were no witnesses left."

Later in his closing argument, the prosecutor emphasized defendant's statements to informants evincing lack of remorse, including his boasts of having sodomized Holman post mortem and laughing about the murder. He thus argued: "And the defendant's comments to other prisoners, especially to Fernando Moreno, show he didn't have any remorse," and "Then, far from

---

[32]Defendant also claims that the trial court's error in failing to conduct further inquiry resulted in violation of his rights under the Sixth and Fourteenth Amendments. There was no error; the provisions are not substantially implicated.

regretting what he did, the defendant lied about it, he laughed about it, he bragged about it." Defendant posed no objection at trial to any portion of this argument.

 Defendant now claims that the prosecutor engaged in misconduct by, in effect, arguing lack of remorse as a factor in aggravation. The claim is not cognizable. Because a timely objection and admonition could have cured any harm flowing from the challenged statements, defendant waived this issue for appeal. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 208-209 [5 Cal.Rptr.2d 796, 825 P.2d 781].) It is, in any event, baseless.

"Although lack of remorse is not a statutory factor, a prosecutor may direct the jury's attention to evidence which reveals a defendant's lack of remorse." (*People* v. *Hardy, supra,* 2 Cal.4th at pp. 209-210; see also *People* v. *Proctor* (1992) 4 Cal.4th 499, 545 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) Moreover, because evidence of remorse was presented by Dr. Vicary in mitigation, the prosecution was entitled to argue the lack of remorse to rebut the existence of that factor in mitigation. (See *People* v. *Cox* (1991) 53 Cal.3d 618, 685 [280 Cal.Rptr. 692, 809 P.2d 351].)

The record discloses that although the prosecution pointed to evidence that defendant boasted and laughed about the murder and expressly argued that the remarks undercut Dr. Vicary's evidence in mitigation, it did not suggest that lack of remorse was a statutory aggravating factor under Penal Code section 190.3.[33]

### 2. *Use of Hypotheticals*

 Defendant claims that the prosecutor's use of hypothetical examples, as discussed above, constituted misconduct because they asserted facts not based on the evidence presented.

The claim of prosecutorial misconduct is not cognizable. The claim was waived by his failure to make an assignment of misconduct or to request that the jury be admonished to disregard the impropriety. (*People* v. *Benson,*

[33]Defendant also claims ineffective assistance of counsel. The claim falls in the absence of prosecutorial misconduct. Additionally defendant claims that the prosecutor's statements violated the due process clause of the Fourteenth Amendment and the cruel and unusual punishment clause of the Eighth Amendment. He also claims that because he denied participation in the crimes, the misconduct violated his Fifth Amendment right against self-incrimination. The claims are not cognizable; they were waived by his failure to make an assignment of error based on the constitutional grounds. (*People* v. *Benson, supra,* 52 Cal.3d at p. 784.) In any event, he merely appends constitutional labels to his claim of prosecutorial misconduct. As discussed in the text, there was no misconduct.

*supra*, 52 Cal.3d at p. 784.) In any event, it fails on its merits: there was no impropriety in the prosecutor's use of hypothetical examples to show that there are varying degrees of culpability even among capital murderers.

The prosecutor expressly referred to his "brief hypothetical examples" and began the examples by asking the jury to "suppose" hypothetical situations. There was no suggestion by the prosecutor that he was referring to factual information outside the record; nor did his use of hypothetical examples improperly use the prestige of the district attorney's office to convince the jury to return a verdict of death. No reasonable juror would have misunderstood the expressly hypothetical examples to refer to evidence outside the record.[34]

### 3. *Defendant's Background as Mitigation*

In the course of presenting hypothetical examples to the jury, the prosecutor stated: "[L]et me give you just a couple of brief hypothetical examples, since this isn't a robbery and how a case like that could be either more serious or less serious without even focusing on the defendant's background."

Defendant argues that the prosecutor's remark improperly suggested to the jury that it could not consider defendant's background in mitigation. The claim was waived by failure to make an assignment of misconduct on that ground in the trial court. (*People* v. *Benson*, *supra*, 52 Cal.3d at p. 784.) It also fails on the merits, in the absence of any impropriety in the prosecutor's remarks. The record discloses that the prosecutor did not, literally or by implication, tell the jury that it may not consider defendant's background in mitigation. There is no reasonable likelihood that this remark would have caused the jury to overlook the trial court's instruction that it consider all evidence under Penal Code section 190.3, factor (k), in mitigation, including evidence of defendant's background.[35]

### 4. *Portrayal of Defense Counsel*

During closing argument, the prosecutor speculated concerning the absence of testimony by defendant's brother Chris Davis, an engineer and

---

[34]Defendant also claims ineffective assistance of counsel. In the absence of any misconduct, the claim falls of its own weight. He additionally claims violation of the Eighth Amendment. He merely reasserts the claim of prosecutorial misconduct using a constitutional label. Like the state law claim, it is not cognizable. (*People* v. *Benson*, *supra*, 52 Cal.3d at p. 784.) It also fails on the merits, for the reasons stated in the text.

[35]The additional claim of ineffective assistance of counsel falls in the absence of misconduct by the prosecutor. Defendant also claims violation of the Eighth Amendment, on the ground that he was "prevented" from presenting evidence of mitigating circumstances from his background. The claim is meritless. As the record demonstrates, he was not prevented from presenting mitigating evidence concerning his background.

college graduate: "Is it that he wouldn't cooperate sufficiently or is it that he knew what they wanted and wasn't willing to do it? And what is it that they wanted[?] . . . Because what was the defense strategy? First to call his mother and let her go and then call a couple of the daughters in to say what a rotten person she was and what a bad family it was. And maybe Chris didn't want to do that." Defendant's objection to the argument was overruled.

The prosecutor also commented on defense strategy "to attack and smear everybody they could in the hopes of somehow deflecting or diffusing blame." He referred to use of psychiatric testimony as "the bottom of the barrel defense." He also referred to "a lot of defense arguments I think was to try to lay a guilt trip on you." No objection was made to these remarks.

 Defendant contends that the argument concerning the absence of testimony by his brother implied that defense counsel engaged in unethical conduct by manipulating witnesses and suppressing testimony of uncooperative witnesses. The claim of prosecutorial misconduct is unconvincing. There is no showing of impropriety. The prosecution did not imply that defendant's counsel fabricated evidence "or otherwise . . . portray defense counsel as the villain in the case." (*People* v. *Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37].) At most, the prosecutor's remarks suggested that testimony offered in mitigation by defendant's sisters might have been one-sided, and that jurors were not required to accept their version of the family history.

As defendant concedes, he waived a claim of prosecutorial misconduct regarding the remaining remarks by his failure to make an assignment of error in the trial court. (*People* v. *Benson*, *supra*, 52 Cal.3d at p. 784.) In any event, the claim is meritless. The prosecutor's comments clearly fell within his right to "fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892].) None of the remarks can be fairly understood to cast aspersions on the integrity of defendant's counsel.[36]

---

[36]Defendant's alternative claim of ineffective assistance of counsel fails in the absence of misconduct. Moreover, even if he had colorable grounds to interpose a timely assignment of misconduct, it is merely speculative that he would have done so. Counsel could reasonably have determined as a matter of sound strategy that an objection to the prosecutor's references to "attack and smear everybody," "the bottom of the barrel defense," and "guilt trip" might lend unnecessary emphasis to the prosecutor's argument. Thus, defendant would in any event be unable to establish that his "counsel's representation fell below an objective standard of reasonableness." (*Strickland* v. *Washington*, *supra*, 466 U.S. at pp. 688, 694 [80 L.Ed.2d at pp. 693-694, 697-698]; *People* v. *Ledesma*, *supra*, 43 Cal.3d at pp. 215-218.) Defendant also

### 5. *Use of "Mitigating" Evidence in Aggravation*

As stated above, Dr. Vicary's testimony in mitigation included discussion of the results of the MMPI, which indicated an elevated score in the category of "mania." In closing argument, the prosecutor commented: "Well, what is mania? It's an impulsive—a person who's impulsive and agitated." He subsequently remarked on Dr. Vicary's prediction that defendant would do well in the prison system: "So what would you expect him to do in the state prison system? Suddenly reform? That's really rather preposterous, isn't it?"

▮▮▮ Defendant claims prosecutorial misconduct, on the ground that the foregoing comments improperly transformed a mitigating factor into an aggravating factor. The claim is waived in the absence of a timely assignment of error in the trial court. (*People* v. *Benson, supra,* 52 Cal.3d at p. 784.) It also fails on the merits, in the absence of any underlying impropriety in the prosecution's remarks. The record discloses that the prosecution's arguments concerning the MMPI results were not offered as circumstances in aggravation but as proper rebuttal of Dr. Vicary's evidence in mitigation. (*People* v. *Cox, supra,* 53 Cal.3d at p. 685.) His arguments concerning future violence also rebutted Dr. Vicary's testimony in mitigation.[37]

### J. *Instruction Regarding Aggravating Factors*

The trial court gave the standard instruction defining aggravating factors listed under Penal Code section 190.3, including factor (a), the circumstances of the crime and existence of special circumstances, and factor (b), presence or absence of other criminal activity involving the use, attempted use, or threat of force or violence.

▮▮▮ Defendant asserts that these aggravating factors are unconstitutionally vague, in violation of the Eighth Amendment. The claim fails under *Tuilaepa* v. *California* (1994) 512 U.S. ___ [129 L.Ed.2d 750, 114 S.Ct. 2630]. In *Tuilaepa,* the United States Supreme Court determined that Penal Code section 190.3, factors (a) and (b) are not impermissibly vague. The court held that both factors meet the constitutional requirement under the Eighth Amendment that factors in capital sentencing have "some 'common sense core of meaning . . . that criminal juries should be capable of

---

again recasts his claims of prosecutorial misconduct and ineffective assistance as constitutional violations of the Eighth, Fourteenth, and Sixth Amendments. There was no misconduct or ineffective assistance.

[37]Defendant's alternative claim of ineffective assistance of counsel fails in the absence of misconduct by the prosecutor. His additional claim under the cruel and unusual punishment clause of the Eighth Amendment lacks a predicate and therefore falls of its own weight.

understanding.' " (512 U.S. at pp. __-__ [129 L.Ed.2d at p. 761, 114 S.Ct. at pp. 2636-2637.)[38]

### K. *Definition of "Force" and "Violence"*

As stated above, the trial court instructed the jury to consider the presence or absence of other criminal activity by the defendant involving the use, attempted use, or threat of force or violence, or the express or implied threat to use force or violence. (Pen. Code, § 190.3, factor (b).) It also instructed the jury to consider three circumstances in aggravation in connection with factor (b): the samurai sword incident against Brown, involving assault with a deadly weapon, exhibition of a deadly weapon, and battery; the jacket-slashing incident against Engblom, involving assault with a deadly weapon and battery; and the batteries of King. The trial court instructed that the jury could not consider any evidence of any other criminal act as an aggravating circumstance under this factor.

The trial court instructed the jury on the crime of battery: "Every person who willfully and unlawfully uses any force or violence upon the person of another, is guilty of a battery." In conjunction with that instruction, the trial court also instructed: "As used in the foregoing *instructions*, the words "force" and "violence" are synonymous and mean any unlawful application of physical force against the person of another, even though it causes no pain or bodily harm or leaves no mark and even though only the feelings of such person are injured by the act. The slightest unlawful touching, if done in an insolent, rude, or an angry manner, is sufficient." (Italics added.) The written instruction to the jury began with the standard language: "As used in the foregoing *instruction* . . . ." (CALJIC No. 16.141, italics added.)

■ Defendant argues that because the trial court referred to "instructions" in the plural, the jury may have applied the definition of "force" and "violence" to *all* of the evidence of his prior criminal activity, including the evidence in aggravation under Penal Code section 190.3, factor (b). He further contends that the definition of "force" and "violence" in the instruction conflicts with the common connotation of the words to imply more than slight touching or injury. He claims that the erroneous instruction thus rendered the other-crimes aggravating factor unconstitutionally vague, because it then does not contain "some common sense core of meaning." (*Tuilaepa* v. *California, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 761, 114 S.Ct. at p. 2636].)

---

[38]Defendant also makes perfunctory claims under the Fifth, Sixth, and Fourteenth Amendments, contending that the instruction leads to the arbitrary imposition of the death penalty. The claims are meritless; the factors are sufficiently clear in meaning to direct the jury's discretion and do not result in an arbitrary penalty verdict.

The claim lacks merit. The written instructions given to the jury for its deliberations correctly referred to the "foregoing instruction." It is generally presumed that the jury was guided by the written instructions. (*People* v. *McLain* (1988) 46 Cal.3d 97, 115 [249 Cal.Rptr. 630, 757 P.2d 569].) We indulge that presumption here.

In any event, defendant merely speculates that the jury might have been confused. There is, however, no reasonable likelihood that the jury erroneously applied the instruction as defendant maintains. (See *People* v. *Clair*, *supra*, 2 Cal.4th at p. 688.)

The jury was separately instructed, with regard to the samurai sword incident, on the elements of assault with a deadly weapon and exhibiting a deadly weapon; it was also instructed on the elements of assault with a deadly weapon, with regard to the jacket-slashing incident. It is not reasonably likely that the jury misapplied the definition of "force" and "violence" in deliberating on those separate crimes.

Moreover, the incidents of battery that the jury was instructed to consider in aggravation indisputably involved the use of "force" and "violence" and "threats" of violence, under their common connotations: in the incident with the samurai sword, defendant kicked the victim and repeatedly lunged at him with the sword; in the knife-slashing incident, defendant slashed at the victim, cutting his jacket with a knife; in batteries against King, defendant struck, choked, and pushed the victim. It is thus not reasonably likely that the jury misapplied the definition of "force" or "violence" for battery to the aggravating circumstances under Penal Code section 190.3, factor (b).

L. *Instruction on Provocation*

At the prosecution's request, the trial court instructed: "No provocative act which does not amount to a threat or attempt to inflict physical injury and no words, no matter how offending or exasperating, are sufficient to justify a battery."

Defendant argues that the trial court erred in failing to observe its "sua sponte duty to not instruct on matters irrelevant to the case." He contends that the instruction may have caused the jury to disregard the evidence he presented in mitigation of the samurai sword incident—that the battery was provoked by the victim's insulting statements about defendant's girlfriend. Similarly, he contends that the jury may have disregarded mitigating evidence he presented regarding battery against King—that she provoked him by deliberately "push[ing] his buttons."

The claim is meritless. There was no prejudice. The instruction correctly stated the law and clarified the elements of battery for the jury. (See *People v. Phillips* (1985) 41 Cal.3d 29, 72-73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) It was not "irrelevant," as defendant contends. Defendant may be understood to claim the court should have omitted or modified the instruction. But in the absence of an objection or a request for modification, the court was under no obligation to do so. (*People v. Bonin* (1989) 47 Cal.3d 808, 856 [254 Cal.Rptr. 298, 765 P.2d 460]; *People v. Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].)

Moreover, in instructing on Penal Code section 190.3, factor (k), the jury was instructed to consider "any sympathetic or other aspect of the defendant's character or record which the defendant offers as a basis for a sentence less than death." (See *People v. Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) The instruction was broad enough to inform the jury that it could consider provocation in mitigation of the penalty. In closing argument, defendant expressly argued in mitigation of the death penalty that the other crimes were initiated by others. It is apparent that the jury was not prevented from giving mitigating weight to defendant's evidence of provocation.[39]

## M. *Instructional Error Regarding Samurai Sword Incident*

As stated above, although defendant was charged in the samurai sword incident with misdemeanor battery and brandishing, he was convicted of brandishing only. At the prosecutor's request, and over defendant's objection, the trial court instructed the jury that it could consider the samurai sword incident in aggravation for brandishing, battery, and assault with a deadly weapon. It instructed the jury on the elements of all three offenses. It also instructed that "[b]efore a juror may consider any such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts."

Defendant claims instructional error. He argues that unless a defendant requests otherwise, the instructions given to a penalty jury concerning other-crimes evidence should be limited "to a single crime that accurately depicts the conduct at issue." When the conduct has resulted in formal charges or convictions, "the rule must be that instruction is confined to the crimes previously charged and providing the basis for the previous conviction." In this case, he argues, the charges of battery and brandishing and the conviction for brandishing should have limited the trial court's instructions.

---

[39]Defendant asserts that the instructional error also violated the Eighth and Fourteenth Amendments. There was no error. The instruction did not substantially implicate the constitutional provisions.

The claim fails. Evidence of prior violent conduct is admitted under Penal Code section 190.3, factor (b), "to enable the jury to make an individualized assessment of the character and history of the defendant to determine the nature of the punishment to be imposed." (*People* v. *Grant, supra,* 45 Cal.3d at p. 851.) " '[I]t is not [only] the fact of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense.' " (*People* v. *Melton, supra,* 44 Cal.3d at p. 754, some italics deleted.) Indeed, Penal Code section 190.3, factor (b), "expressly permits proof of *any* violent 'criminal activity' regardless of whether it led to prosecution or conviction." (44 Cal.3d at p. 754)

It is thus irrelevant that defendant was not convicted of, or formally charged with, the crime of assault with a deadly weapon. The jury was properly permitted to consider defendant's conduct in aggravation if it determined that the elements of the crime of assault with a deadly weapon were proved beyond a reasonable doubt.[40]

### N. *Requested Instruction on Lingering Doubt*

Defendant requested the following instruction: "Each individual juror may consider as a mitigating factor residual or lingering doubt as to whether Larry David Davis intentionally killed Dawn Holman. [¶] Lingering or residual doubt is defined as the state of mind between 'beyond a reasonable doubt' and 'beyond all possible doubt.' [¶] Thus, if any individual juror has a lingering or residual doubt about whether the defendant intentionally killed Dawn Holman, you must consider this as a mitigating factor and assign it the weight you feel is appropriate." The prosecutor objected to the instruction.

The trial court refused to give the instruction. It did, however, give the expanded Penal Code section 190.3, factor (k) instruction: "[In determining the penalty, the trial of fact shall take into account] . . . (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (See Pen. Code, § 190.3, factor (k).)

In closing argument, defendant urged the jury to consider that defendant might be telling the truth about what happened the night Holman was murdered and the consequences if their verdict on the guilt phase was wrong. He also specifically argued "lingering doubt," explaining that "lingering

---

[40]Defendant contends that the error resulted in violation of the Eighth and Fourteenth Amendments, because it deprived him of a reliable penalty determination. There was no error.

doubt has been defined as meaning somewhere between beyond a reasonable doubt and beyond all doubt."

██ Defendant claims that the trial court erred, both under state law and in violation of the Eighth and Fourteenth Amendments, by refusing the proffered special instruction. No error appears. The expanded Penal Code section 190.3, factor (k) instruction was broad enough to include "lingering doubt." (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1104 [25 Cal.Rptr.2d 867, 864 P.2d 40].) "Of course, a 'defendant has no federal or state constitutional right to' a 'lingering doubt' instruction." (*Ibid.*)

### O. *Instruction Regarding Special Circumstances*

The jury found true two special circumstances: that the murder was committed during the commission or attempted commission of kidnapping and of sodomy. At the penalty phase, the trial court instructed the jury under CALJIC No. 8.85, in relevant part, as follows: "You shall consider and take into account and be guided by the following factors if applicable: A, the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found true."

██ Defendant argues that the trial court erred in so instructing the jury, because it permitted the jury to consider both the sodomy and kidnapping special circumstances as multiple factors in aggravation, even though the two crimes were part of a single course of conduct.

The claim is meritless. We rejected a similar claim of "double-counting" of special circumstances in *People* v. *Melton*, *supra*, 44 Cal.3d at page 765. In *Melton*, the defendant urged that since separate robbery and burglary special circumstances "arose from 'indivisible' criminal conduct with a single criminal intent," they could not *each* be considered a distinct aggravating factor at the penalty phase. (*Ibid.*) We found no error: "Section 190.3, [factor] (a), directs the jury to consider generally 'the circumstances' of the capital crime. Even if the additional phrase 'and the existence of any special circumstances [previously] found to be true' was missing, the sentencing jury would be statutorily entitled to evaluate *all the conduct* which led to the capital conviction." (*Id.* at p. 766.)

The same result applies here. Paraphrasing *Melton*, it is legitimate for the state to determine that a death-eligible murderer is more culpable, and thus more deserving of death, if he not only kidnapped the victim but committed an additional and separate felonious act of sodomy in connection with the

murder. (*People* v. *Melton, supra*, 44 Cal.3d at p. 767.) The jury is statutorily entitled to evaluate all of the conduct which led to the capital conviction. (*Id.* at p. 766.)[41]

P. *Inquiry Into Possible Juror Misconduct*

After the trial court instructed the jury during the penalty phase, but before deliberations, Juror Schwartz, the foreman during the guilt phase and later the foreman during the penalty phase, submitted a written note asking a series of questions.[42]

The trial court discussed the matter with counsel. Defendant requested further inquiry from Juror Schwartz and the other jurors to determine if the questions were from the jury as a whole. He further requested that Juror Schwartz be discharged from the jury and that the trial court conduct an inquiry as to whether the matters referred to in the questions had been the subject of discussion amongst the jurors. The prosecutor objected to these requests, arguing that the note did not suggest any impropriety.

The trial court found nothing improper about the questions and concluded that no inquiry was appropriate. It suggested instructing the jury that the Governor had the power of commutation and it was not to consider

---

[41]Defendant also asserts that the instruction violated the Eighth and Fourteenth Amendments. In *Melton*, we expressly rejected similar constitutional claims, holding that there was no violation of the Eighth Amendment or other constitutional provisions. (*People* v. *Melton, supra*, 44 Cal.3d at pp. 766-767.) The Fourteenth Amendment is not substantially implicated by the instruction.

[42]The note was as follows: "1) If we cannot come to unanimous agreement on the penalty for the defendant, what will happen next? [¶ 2) If we decide on the gas chamber as penalty, is there any reason that we should expect that his punishment will ever actually occur in California? [¶ 3) If we decide on life without parole as penalty, and our original verdict of guilt is not overturned, will the defendant actually spend life in prison without parole or could he later be paroled by some higher authority? [¶ 4) Can you describe the impact on the legal system (and taxpayers) which would likely occur for either of the two penalty decisions? In other words, it has been said that a death penalty decision results in millions of dollars of legal expense for the taxpayers of California due to appeals, etc. In the end, the penalty is not administered. [¶ 5) Can you reassure us that this phase is not just a legal formality and that the result of our deliberations will really have some significance in seeing that justice will prevail? [¶ 6) (Reference above questions.) It is my impression that a death penalty sentence will actually result in life without parole. A life without parole sentence will not stick, i.e. the defendant will later be paroled. Can you comment on this. [¶ 7) I am having a lot of difficulty with the fact that Eunice [Abbiatti] has been removed from the jury—especially without an explanation."

such power in its deliberations. Defendant objected, on the ground that there had been a question from only one juror.[43]

The following morning, the trial court informed the jury that it had received a series of questions, which it paraphrased. It instructed the jury as follows: "Ladies and gentlemen, you are instructed that under the Constitution of the State of California, a governor is empowered to grant a reprieve, pardon or commutation after sentence following a conviction of any crime. [¶] Under this power the governor in the future may commute or modify a sentence of death or a sentence of life without possibility of parole to a lesser sentence including a sentence which includes the possibility of parole. [¶] A sentence of life without possibility of parole means that the defendant will spend the remainder of his natural life in prison; therefore, the matter of parole is not to be considered by you in determining the punishment for the Defendant. [¶] If upon consideration of the evidence you believe that life without possibility of parole is the proper sentence, you must assume that those officials charged with the operation of our prison system will perform their duties in that regard in a correct and responsible manner. It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the prison authorities or the governor of the state will properly carry out their responsibilities. [¶] Likewise, it would be a violation of your duty as jurors if you were to consider cost to the taxpayers and other impacts on the legal system or the prison system in determining the appropriate punishment; therefore, you are limited to those matters which are properly before you in this case which have been brought to your attention by the evidence and by the instructions of the Court and you are not to consider matters that are not properly before you by the evidence or the instructions of the Court."

 Defendant contends that the trial court erred in failing to conduct a sufficient inquiry into possible jury misconduct. He also claims that it was error to instruct the entire jury on commutation and cost without first determining that these issues were concerns of the jury as a whole. He is unpersuasive.

A trial court must conduct a sufficient inquiry to determine facts alleged as juror misconduct "whenever the court is put on notice that good cause to discharge a juror may exist." (*People* v. *Burgener* (1986) 41 Cal.3d 505, 519 [224 Cal.Rptr. 112, 714 P.2d 1251].) On this record, we cannot conclude that the trial court was put on notice of good cause to discharge Juror Schwartz. Accordingly, it did not err in refusing defendant's request to conduct an

---

[43]Defendant had requested a similar instruction regarding commutation before Juror Schwartz submitted his questions. At that time, the trial court refused the instruction.

inquiry into whether the jury had engaged in premature deliberations concerning penalty.

Defendant merely speculates that there might have been jury misconduct. Mere questions from individual jurors prior to actual deliberations do not constitute jury misconduct. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 481 [276 Cal.Rptr. 356, 801 P.2d 1107].) The note does not evince bias on the part of Juror Schwartz; nor does it suggest that the jury improperly discussed the case prior to its submission to them. Accordingly, no duty arose on the part of the trial court to discharge Juror Schwartz or conduct an inquiry.

The trial court also did not err in instructing the jury regarding commutation, or in doing so without first conducting a full-blown inquiry. The court has authority to give an instruction regarding commutation "where it has reason to believe that the jury is speculating about such a future reduction of sentence." (*People* v. *Whitt* (1990) 51 Cal.3d 620, 657 [274 Cal.Rptr. 252, 798 P.2d 849]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 159, fn. 12 [207 Cal.Rptr. 800, 689 P.2d 430].) The instruction given by the trial court adequately advised the jury as to its proper sentencing considerations and responsibilities. (*People* v. *Hunter* (1989) 49 Cal.3d 957, 983 [264 Cal.Rptr. 367, 782 P.2d 608].)

On the basis of the questions in Juror Schwartz's note, the trial court could reasonably conclude that the instruction, which it had earlier declined to give at defendant's request, should be given to the jury. (See *People* v. *Hill* (1993) 3 Cal.4th 959, 1011 [13 Cal.Rptr.2d 475, 839 P.2d 984] [trial court instructed the jury as a whole on commutation after a single, unidentified juror submitted a handwritten note to the court concerning "chance of parole"].) The trial court also could reasonably conclude "that any further inquiry about the exact nature of the jury's concern would only have focused its attention on irrelevant matters." (*People* v. *Whitt, supra,* 51 Cal.3d at p. 657.)[44]

### Q. *Lack of Procedural Safeguards*

In a perfunctory catch-all claim, defendant argues that the Eighth and Fourteenth Amendments mandate certain procedural safeguards that were not extended to him. He lists 10 purported requirements, each of which we have previously rejected, as follows: (1) an instruction that jurors must find

---

[44]Defendant also claims that the trial court's failure to inquire into possible misconduct impaired his rights under the Sixth, Eighth, and Fourteenth Amendments. The provisions are not substantially implicated by the trial court's proper determination that no such inquiry was required.

beyond a reasonable doubt that death is the appropriate penalty (see *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]); (2) an instruction that aggravating factors or their constituent factors are true beyond a reasonable doubt (see *ibid.*); (3) written findings on aggravating factors (see *People* v. *Fauber, supra,* 2 Cal.4th at p. 859); (4) jury unanimity on aggravating factors (see *People* v. *Berryman, supra,* 6 Cal.4th at pp. 1101-1102, fn. 24); (5) an instruction that aggravating factors be found to outweigh mitigating factors beyond a reasonable doubt *(People* v. *Visciotti, supra,* 2 Cal.4th at pp. 67-68); (6) jury unanimity in finding prior criminal activity (see *People* v. *Jennings* (1988) 46 Cal.3d 963, 988 [251 Cal.Rptr. 278, 760 P.2d 475]); (7) deletion of inapplicable sentencing factors from the penalty phase jury instructions (see *People* v. *Hardy, supra,* 2 Cal.4th at p. 203); (8) designation of which factors are aggravating and which mitigating (see *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 148-149 [2 Cal.Rptr.2d 335, 820 P.2d 559]); (9) a prohibition against considering unadjudicated other prior offenses as aggravating evidence (see *People* v. *Danielson, supra,* 3 Cal.4th at p. 719); (10) intracase and intercase proportionality review (see *People* v. *Clark* (1993) 5 Cal.4th 950, 1039-1040 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)[45] Defendant offers no reason why we should depart from our previous holdings.

## R. *Application to Modify the Death Verdict*

In ruling on defendant's automatic application to modify the verdict of death under Penal Code section 190.4, subdivision (e), the trial court independently reviewed and reweighed the evidence of mitigating and aggravating factors. ■ Defendant contends the trial court erred in failing to consider certain evidence in mitigation, and also in improperly considering other evidence in aggravation, as follows.

### 1. *Mitigating Evidence*

In reviewing the mitigating factors under Penal Code section 190.3, the trial court stated: "I just want to mention several of the factors that are, perhaps maybe even all of them, that I don't think apply in this case, and independently weighing the evidence, I don't believe that a jury could have been concerned with because they really just don't—just don't exist. [¶] I think the most obvious—it's going to take me a moment to find the right

---

[45]In *People* v. *Clark, supra,* 5 Cal.4th at page 1039, we held that imposition of the death sentence is subject to "intracase" review to determine whether the penalty is disproportionate to a defendant's culpability. Defendant offers no factual or legal basis for concluding that the death sentence imposed here was such.

page—I think the most obvious or [*sic*] sub-factor D. [¶] What is sub-factor C? [¶] Let me start with that; prior felony convictions. [¶] Other than the crimes presently involved, the defendant had no prior felony convictions at all and the jurors were not told of any that didn't exist."

The trial court also discussed defendant's character traits in mitigation, noting "clear evidence the defendant was a good father . . . a good provider, that basically the situation is he got along well with people . . . when motivated he could perform . . . and basically was a good employee and a professional in a trade that is not—not an easy trade to, first of all, obtain employment in and to—and to last. [¶] So there were a lot of positive things presented to the jury about the defendant's background and his character. [¶] On the other side, I don't suppose this really distinguishes the defendant from a whole lot of other people . . . These are all good, strong character traits but a lot of other people, but certainly when you are looking at issues of whether or not someone ought to die for their crime or their crimes, these are things that were well presented and they speak well of the defendant."

Citing to portions of these remarks, defendant claims that the trial court unconstitutionally restricted consideration of mitigating factors by failing to give any weight to evidence that he was a good father and provider or to defendant's lack of felony convictions.

The claim is without merit. The record demonstrates that the trial court expressly considered defendant's "good strong character traits," including evidence that he was a good father and good provider.

Moreover, even assuming that the trial court improperly failed to accord mitigating weight to the absence of prior felony convictions, the error was harmless in light of the substantial countervailing evidence of prior violent activity that the trial court properly considered as a factor in aggravation.

### 2. *Aggravating Evidence*

In discussing the factors in aggravation, the trial court reviewed the circumstances of the crime. It commented that, after defendant entered Holman's car, "[w]e don't know what happened and we are never going to know that happened because only two people ever did know what happened in my view of the evidence and that's the victim, who can't tell us what happened, and the other is the defendant who wouldn't or won't tell us what happened." The trial court then reviewed the circumstantial evidence, concluding that the circumstances of the crime were "extremely aggravated,

extremely cruel, and extremely brutal." It concluded that "the weight of the evidence does support the jury's verdict. [¶] I think that they logically, carefully and correctly concluded that the aggravating factors in this case, the crime itself, in addition to the criminal conduct involving violence, substantially outweighed the mitigating evidence that was presented."

Defendant contends that the trial court improperly used the mitigating factor of "residual doubt" as a factor in aggravation, presumably under Penal Code section 190.3, factor (a), circumstances of the crime. The claim fails for the lack of any support in the record. The trial court did observe that there was no direct evidence about the circumstances of the crime, in its view because defendant did not testify about what happened. The comment is, however, unexceptional. Contrary to defendant's claim, it does not indicate that the trial court regarded defendant's failure to testify as a factor in aggravation.

Nor, as defendant seems to imply, was the trial court precluded from considering the circumstances of the crime as a factor in aggravation under Penal Code section 190.3, factor (a), merely because defendant argued "residual doubt" in mitigation. It properly evaluated the circumstantial evidence for that purpose.

S. *Sentencing Error*

For the conviction of assault with intent to commit rape and/or sodomy on Suzanne H., the trial court sentenced defendant as follows: "As to Count 6 [assault with intent to commit rape and/or sodomy], again probation denied. Defendant is committed to the Department of Corrections for the midterm of four years; that is, as to this count, the Court finding that factors in aggravation and mitigation are about equal. . . . As to Count 6, I am going [to] find that to be the principal term since that is the term with the most punishment and I'm going to impose that term at this time. I'm going to order that term run consecutive to the indeterminate sentence imposed in Count 1." Defendant did not interpose an objection.

 Defendant claims error based on the trial court's failure to articulate reasons for imposing the sentence consecutively, and seeks remand for resentencing.

As we explained in *People* v. *Scott* (1994) 9 Cal.4th 331, 353 [36 Cal.Rptr.2d 627, 885 P.2d 1040]: "Although the court is required to impose sentence in a lawful manner, counsel is charged with understanding,

advocating, and clarifying permissible sentencing choices at the hearing. Routine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention. As in other waiver cases, we hope to reduce the number of errors committed in the first instance and preserve the judicial resources otherwise used to correct them."

Although we held that objections concerning the manner in which the trial court exercises its sentencing discretion and articulates—or fails to articulate—its supporting reasons cannot be raised for the first time on appeal, we determined that we would apply the waiver rule only prospectively. (*People v. Scott, supra*, 9 Cal.4th at pp. 357-358.) Defendant's claim, which involves a sentencing hearing antedating our holding in *Scott*, is therefore cognizable. Nonetheless, we conclude that remand for resentencing is not required on this record.

The California Rules of Court set forth the criteria affecting the decision to impose consecutive rather than concurrent sentences. (Cal. Rules of Court, rule 425.) Rule 425(a) provides that one criterion is whether the crimes involved separate acts of violence. The Holman murder and the assault on Suzanne H. were predominantly independent and involved separate acts of violence. Furthermore rule 425(b) provides: "Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences." Only one criterion or factor in aggravation is necessary to support a consecutive sentence. (*People v. Bravot* (1986) 183 Cal.App.3d 93, 98 [227 Cal.Rptr. 810].) There were several aggravating circumstances in the incident involving Suzanne H. supporting a consecutive sentence. The victim was particularly vulnerable and the manner in which defendant carried out the assault, involving luring her to a remote location, indicated planning. (Cal. Rules of Court, rule 421(a)(3) & (8) [circumstances in aggravation].)

Our review of the entire record thus supports the sentence rendered. It is not reasonably probable that a more favorable sentence would have been imposed in the absence of error. (See *People v. Champion* (1995) 9 Cal.4th 879, 934 [39 Cal.Rptr.2d 547, 891 P.2d 93] [failure to state reasons for sentencing was harmless error]; *People v. Avalos* (1984) 37 Cal.3d 216, 233 [207 Cal.Rptr. 549, 689 P.2d 121]; *People v. McLeod* (1989) 210 Cal.App.3d 585, 590 [258 Cal.Rptr. 496].)

## IV. DISPOSITION

Having found no reversible error or other defect, we conclude that the judgment should be affirmed.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

Appellant's petition for a rehearing was denied August 23, 1995, and the opinion was modified to read as printed above.